RELIGIOUS TECHNOLOGY
CENTER, Plaintiff,

v.

Arnaldo Pagliarina LERMA, Digital Gateway Systems, The Washington Post, Marc Fisher, and Richard Leiby, Defendants.

Civ. A. No. 95–1107–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 28, 1995.

Bruce B. McHale, Local Counsel, Alexandria, VA, for Religious Technology Center.

Jay Ward Brown, Washington, DC, for Arnaldo P. Lerma.

Michael A. Grow, Washington, DC, for Digital Gateway Systems.

John P. Corrado, Local Counsel, Alexandria, VA, for The Washington Post, Marc Fisher, and Richard Leiby.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

■ Before the Court is the Motion for Summary Judgment filed by defendants, The Washington Post, and two of its reporters, Marc Fisher and Richard Leiby (hereinafter referred to collectively as "The Post"). A court may grant summary judgment "only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990) (citing Fed.R.Civ.P. 56(c)). In ruling on such motions, the court must construe the facts and all inferences drawn from those facts in favor of the non-moving party. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). Having performed this analysis, the Court finds that summary judgment should be entered in favor of the defendants.

### 1. UNDISPUTED FACTS

The essential facts are not in dispute. In 1991, the Church of Scientology sued Steven Fishman, a disgruntled former member of the Church of Scientology, in the United States District Court for the Central District of California. *Church of Scientology Int'l v. Fishman*, No. CV 91–6426. On April 14, 1993, Fishman filed in the open court file what has come to be known as the Fishman affidavit, to which were attached 69 pages of what the Religious Technology Center ("RTC") describes as various Advanced Technology works, specifically levels OT–I through OT–VII documents. Plaintiff claims that these documents are protected from both unauthorized use and unauthorized disclosure under the copyright laws of the United States and under trade secret laws, respectively.

In California, the RTC moved to seal the Fishman affidavit, arguing that the attached AT documents were trade secrets. That motion was denied and the Ninth Circuit upheld the district court's decision not to seal the file. *Church of Scientology Int'l v. Fishman*, 35 F.3d 570 (9th Cir.1994). The case was remanded for further proceedings and the district court again declined to seal the file, which remained unsealed until August 15, 1995.

Defendant Arnaldo Lerma, another former Scientologist, obtained a copy of the Fishman affidavit and the attached AT documents. Lerma admits that on July 31 and August 1, 1995, he published the AT documents on the Internet through defendant Digital Gateway Systems ("DGS"), an Internet access provider. RTC, which regularly scans the Internet, discovered the publication of documents and on August 11, 1995, warned Lerma to return the AT documents and not publish them any further. After Lerma refused to cooperate, RTC obtained a Temporary Restraining Order prohibiting Lerma from any further publication of the documents and a seizure warrant which authorized the United States Marshal to seize Lerma's personal computer, floppy disks and any copies of the copyrighted works of L. Ron Hubbard, the author of the AT documents.

During the same time period, on or about August 5 or 6, 1995, Lerma sent a hard copy of the Fishman affidavit and AT attachments to Richard Leiby, an investigative reporter for The Washington Post. On August 12, 1995, counsel for RTC discovered this disclosure and approached The Post, which was told that the Fishman affidavit might be stolen. In response to the RTC's representations, The Post returned the actual copy which Lerma had given it. However, The Post had by then learned that a copy of the

same Fishman affidavit was available in the open court file in the United States District Court for the Central District of California. On August 14, 1995, The Post sent Kathryn Wexler, a news aide stationed in California, to that court to obtain a copy of the Fishman affidavit. The Clerk's office made a copy for Wexler, who then mailed it to Washington. Although it is undisputed that RTC staff members had been checking that file out and holding it all day to prevent anyone from seeing it, the file was not sealed and obviously was available, upon request, to any member of the public who wished to see it.

The day after The Post obtained its copy of the Fishman affidavit, the RTC applied for a sealing order and the trial judge ordered the file sealed. However, there is no evidence in the record that the judge ordered The Post to return the copy made by the Clerk's office or that any kind of a restraining order was issued by that court against The Post.

Five days later, on August 19, 1995, The Post published a news article, entitled "Church in Cyberspace: Its Sacred Writ is on the Net. Its Lawyers are on the Case," written by defendant Marc Fisher. In that article, RTC's lawsuit against Lerma and the seizure of his computer equipment were discussed, as was the history of Scientology litigation against its critics and the growing use of the Internet by Scientology dissidents. The article included three brief quotes (totalling 46 words) from three of the AT documents. On August 22, 1995, the RTC filed its First Amended Verified Complaint for Injunctive Relief and Damages in which it added The Washington Post and its two reporters, Fisher and Leiby, as additional defendants. A Second Amended Verified was later filed and is now the subject of this summary judgment motion.

## II. THE COPYRIGHT CLAIM

Although the Court has serious reservations about whether the AT documents at issue in this litigation are properly copyrighted, for the purposes of this motion, the Court assumes that the RTC holds properly registered, valid copyrights for the AT documents attached to the Fishman affidavit.

■ The Post does not deny that it copied the AT documents and quoted from them. It argues, however, that this copying and these quotations fall squarely within the "fair use" exception. Thus, the dispositive issue as to the copyright claim is whether or not The Post's use of the AT documents falls within the fair use exception to the copyright law. Under that exception, "the fair use of a copyright ... for purposes such as criticism, comment, *news reporting* ... or *research,* is not an infringement of copyright." 17 U.S.C.A. § 107 (West Supp.1995) (emphasis added). As the Supreme Court has held "fair use is a mixed question of law and fact." *Harper & Row Publishers Inc. v. Nation Enters,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985). In the instant case, the Court finds no material facts in dispute; therefore, the issue can be resolved as a matter of law.

■ At the outset of its opposition, the RTC argues that because the fair use doctrine is an equitable one, The Post should not be allowed to rely on this defense because of unclean hands. Specifically, the RTC points to The Post's failure to disclose that it had made several copies of the Fishman affidavit. In an affidavit signed on September 26, 1995, Mary Ann Werner, a Post Vice President and counsel, averred that "only one copy of that [Fishman] declaration has been made." In fact, through discovery RTC has learned, and The Post does not dispute, that other copies were made. Wexler admits that she made an additional copy of the materials received from the Clerk's office. She sent that copy to Washington as well to ensure that Washington got a copy. A second copy was created, not by copying the Fishman affidavit which had been obtained in California, but by down loading a copy off the Internet. The Post argues persuasively here that the presence of the AT documents on the Internet was part of their very news worthiness and that making this copy was an act of legitimate news gathering.

A third copy of the AT documents was generated after Lerma sent a duplicate of the Fishman affidavit to Leiby via e-mail. That e-mail was copied to a disk in response to a demand by RTC's counsel on August 12,

1995, that The Post secure any materials it had been sent by Lerma. (Second Werner Decl. §§ 4–5).

None of these acts of copying strike this Court as constituting unethical behavior and the Court is satisfied from her second declaration that Ms. Werner did not mislead the Court or counsel in referring to one copy. In any case, the Court agrees with The Post that the issue of unclean hands is a weak attempt by RTC to avoid the real issue of fair use.

■ In determining whether the use of a copyrighted work is fair use and therefore not an infringement, the Court must consider four factors:

> 1. the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> 2. the nature of the copyrighted work;
> 3. the amount and substantiality of the portion used in relation to the copyrighted work as a whole;
> 4. the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C.A. § 107 (West Supp.1995). These four statutory factors may not "be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music Inc.*, —— U.S. ——, —————, 114 S.Ct. 1164, 1170–71, 127 L.Ed.2d 500 (1994). The interplay of the four factors is recognized elsewhere as well. See, e.g., *Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417, 449–50, 104 S.Ct. 774, 792–93, 78 L.Ed.2d 574 (1984) (reproduction of entire work "does not have its ordinary effect of militating against a finding of fair use" as to home videotaping of television programs); *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 564, 105 S.Ct. 2218, 2232, 85 L.Ed.2d 588 (1985) ("[E]ven substantial quotations might qualify as fair use in a review of a published work or

a news account of a speech" but not in a scoop of a soon-to-be-published memoir). Thus, we may not evaluate any single fair use factor in isolation.

■ As to the first factor, the purpose and character of the use, there is no evidence in this record that The Post copied the AT documents for any purposes other than news gathering, news reporting and responding to litigation. Although the RTC has argued that The Post harbors some animus towards Scientology, an unbiased observer would conclude that the Church of Scientology and its treatment of critics is a newsworthy subject about which The Post is permitted to investigate and report. There is no evidence that The Post was trying to "scoop" the RTC in quoting the AT documents or trying to avoid payment of a royalty, conduct to which other courts have looked in finding that a media organization violated copyright. *Harper & Row Publishers, Inc., v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Iowa State University Foundation, Inc., v. American Broadcasting Co., Inc.*, 463 F.Supp. 902 (S.D.N.Y.1978).

■ Under the second factor, the scope of the fair use doctrine is greater with respect to factual works than creative or literary works. Hubbard's works are difficult to classify and courts dealing with this issue have differed in their conclusion. As the Second Circuit stated in *New Era Publications Int'l v. Carol Publishing Group*, 904 F.2d 152, 158 (2d Cir.), *cert. denied*, 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990), "reasonable people can disagree over how to classify Hubbard's works." However, that court also concluded that the works "deal with Hubbard's life, his views on religion, human relations, the Church, etc.—[and] are more properly viewed as factual or informational." *Id.* at 157. The United States District Court for the Southern District of California is of another view, however. In *Bridge Publications, Inc. v. Vien*, 827 F.Supp. 629, 636 (S.D.Cal.1993), the court stated that "[t]he undisputed evidence shows that L. Ron Hubbard's works are the product of his creative thought process, and not merely informational."

However, in this litigation the RTC has characterized the AT documents essentially as training materials. Therefore, this Court concludes that despite their obtuse language the AT documents are intended to be informational rather than creative and, therefore, that a broader fair use approach is appropriate.

To evaluate the third factor, which essentially requires making a qualitative as well as quantitative analysis of the use made of the work, the three quotes need to be read in the context of the article. The first and longest quote is obviously included merely as an example of the obtuse language used in the AT documents. No fair-minded reader could possibly construe this quote otherwise.

Most of the 103 pages of disputed texts from the Fishman file are instructions for leaders of the OT training sessions. They are written in the dense jargon of the church. *'If you do OT IV and he's still in his head, all is not lost, you have other actions you can take. Clusters, Prep–Checks, failed to exercise directions.'*

The second quote describes how in "one high-level OT session trainees are asked to pick an object *'wrap an energy beam around it'* and pull themselves toward the object." The last quote occurs in the very next sentence which describes how trainees are to *"be in the following places—the room, the sky, the moon, the sun."* These underlined words comprise the total of the copyrighted materials quoted.

■ The RTC argues that where quotes, although fragmentary, are of "significant material," even *de minimis* copying infringes. It then bootstraps this argument by claiming that because Fisher chose to include these three quotes in his article, the quoted language must necessarily be significant. Under this reasoning, no one, let alone a newspaper, could ever quote from copyrighted materials without fear of being hauled into court for infringement because any quote would be deemed significant. To accept this argument would essentially destroy the fair use doctrine. It also clearly is unsupported by the facts because as discussed above, the three quotes, read in context of the entire article, are offered solely as illustrations of

the author's claims about Scientology. They are not intended to offer a complete definition of the Scientology religion or to capture the total essence of what it means to be a Scientologist.

Lastly, we must look at the effect of The Post's use upon the potential market for or value of the copyrighted work. Although the RTC claims it has demonstrated an enormous effect upon its potential market, a fair view of the record discloses no evidence of any economic exploitation by The Post of RTC's copyrighted material. As The Post cogently argues, no follower of Scientology could possibly be satisfied by these three random fragments quoted in its article so as to bypass the complete regime of indoctrination.

■ Although both sides have raised numerous additional issues, the essential analysis for the copyright claim comes down to these four factors. Based on this analysis, we find for the defendants. RTC properly argues that the mere existence of a copyrighted work in an open court file does not destroy the owner's property interests in that work. In the same way, the placement of a copyrighted book on a public library shelf does not permit unbridled reproduction by a potential infringer. However, RTC cannot selectively avail itself of only a segment of the copyright law. With the preservation of copyright protection invariably comes the fair use exception, and on that ground The Post's actions are proper.

### III. ATTORNEY'S FEES

■ Because The Post has been found to be the prevailing party on the copyright claim, it qualifies for an award of attorney's fees and litigation expenses. The RTC opposes such an award. Whether to award such fees is a matter left to the Court's discretion. *Fogerty v. Fantasy, Inc.,* —— U.S. ——, ——, 114 S.Ct. 1023, 1033, 127 L.Ed.2d 455 (1994). In deciding the appropriateness of a fee award, the Court should consider the motivation of the plaintiff in bringing the action for copyright infringement and the extent to which plaintiff's posi-

tion is reasonable and well-grounded in fact and law.

■ On the first issue, the Court finds that the motivation of plaintiff in filing this lawsuit against The Post is reprehensible. Although the RTC brought the complaint under traditional secular concepts of copyright and trade secret law, it has become clear that a much broader motivation prevailed—the stifling of criticism and dissent of the religious practices of Scientology and the destruction of its opponents. L. Ron Hubbard, the founder of Scientology, has been quoted as looking upon the law as a tool to

> [h]arass and discourage rather than to win. The law can be used very easily to harass and enough harassment on somebody who is simply on the thin edge anyway, well knowing that he is not authorized, will generally be sufficient to cause his professional decease. If possible, of course, ruin him utterly.

(Declaration of Mary Ann Werner, Attachment A, at C5; see also The Post's reply brief at p. 24, note 23).

The context and extent in which The Post copied and quoted from the AT documents was so *de minimis* that this Court finds that no reasonable copyright holder could have in good faith brought a copyright infringement action. Although there are limits beyond which the media may not go, even in the interests of news gathering and reporting, this case does not come anywhere near those limits. Therefore, an award of reasonable attorneys' fees is appropriate and granted.

## IV. MISAPPROPRIATION CLAIM

■ To prove misappropriation of a trade secret, the RTC must show (1) that it possessed a valid trade secret, (2) that the defendant acquired its trade secret, and (3) that the defendant knew or should have known that the trade secret was acquired by improper means. *Trandes Corporation v. Guy F. Atkinson,* 996 F.2d 655, 660 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 443, 126 L.Ed.2d 377 (1993).

■ The Post argues persuasively that the AT documents were no longer trade secrets by the time The Post acquired them.

They point to the following undisputed facts. First, the Fishman affidavit had been in a public court file from April 14, 1993 until August 15, 1995, for a total of 28 months. Although RTC has shown that it went to extraordinary efforts to control access to that file by having church members sign out the file and keep it in their custody at the courthouse, the file nevertheless was an open file, available to the public. The Post was able to obtain a copy of the Fishman affidavit without any difficulty, by merely asking the Clerk of the court to copy it. Thus, having been in the public domain for an extensive period of time, these AT documents cannot be deemed "trade secrets." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 484, 94 S.Ct. 1879, 1887, 40 L.Ed.2d 315 (1974).

Of even more significance is the undisputed fact that these documents were posted on the Internet on July 31 and August 1, 1995. (Lerma Affidavit). On August 11, 1995, this Court entered a Temporary Restraining Order among other orders which directed Lerma to stop disseminating the AT documents. However, that was more than ten days after the documents were posted on the Internet, where they remained potentially available to the millions of Internet users around the world.

■ As other courts who have dealt with similar issues have observed, "posting works to the Internet makes them 'generally known'" at least to the relevant people interested in the news group. *Religious Technology Center v. Netcom On–Line Communications Services, Inc.,* No. C. 95–20091 RMW (N.D.Cal.) Slip Opinion entered 9/22/95 at 30. Once a trade secret is posted on the Internet, it is effectively part of the public domain, impossible to retrieve. Although the person who originally posted a trade secret on the Internet may be liable for trade secret misappropriation, the party who merely down loads Internet information cannot be liable for misappropriation because there is no misconduct involved in interacting with the Internet.

■ Even if one were to assume that the AT documents are still trade secrets, under Virginia law, the tort of misappropriation of

trade secrets is not committed by a person who uses or publishes a trade secret unless that person has used unlawful means, or breached some duty created by contract or implied by law resulting from some employment or similar relationship. *Smith v. Snap–On Tools Corp.*, 833 F.2d 578, 581 (5th Cir.1988); *Aerospace Am., Inc. v. Abatement Tech., Inc.*, 738 F.Supp. 1061, 1071 (E.D.Mich.1990).

> It is the *employment of improper means to procure the trade secret, rather than the mere copying or use,* which is the basis of [liability] ... Apart from breach of contract, abuse of confidence or impropriety in the means of procurement, trade secrets may be copied freely as devices or processes which are not secret.

*Trandes Corporation v. Guy F. Atkinson Company*, 996 F.2d at 660 (quoting the Restatement (First of Torts)) (emphasis in original). The *Trandes* court notes that abuse of confidence or impropriety in the means of procurement represented the "essential element" and the "core" of a misappropriation claim. *Id.*

▮ The RTC claims that because The Post was on notice of the RTC's allegations that the AT documents were stolen and were both trade secrets and unpublished copyrighted works, The Post was under a legal obligation not to copy or use the documents. This Court knows of no law which required The Post to sit on its hands and do no further investigation into what was obviously becoming a newsworthy event and newsworthy documents. The RTC's allegations are still just allegations. The very court from which the Fishman affidavit was obtained still has under advisement the issue of whether the AT documents are trade secrets. Although The Post was on notice that the RTC made certain proprietary claims about these documents, there was nothing illegal or unethical about The Post going to the Clerk's office for a copy of the documents or downloading them from the Internet.

Because there is no evidence that The Post abused any confidence, committed an impropriety, violated any court order or committed any other improper act in gathering information from the court file or down loading information from the Internet, there is no possible liability for The Post in its acquisition of the information. This is true regardless of the documents status as trade secrets. As for the disclosure of the information, The Post did nothing more than briefly quote from publicly available materials. These acts simply do not approach a trade secret misappropriation, and, therefore, summary judgment must be entered for the defendants.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.