**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOHN SUNDEMAN, Successor Personal
Representative of the Estate of
Marjorie Kinnan Rawlings Baskin;
FLORIDA FOUNDATION,

No. 97-1339

Plaintiffs-Appellants,

v.

THE SEAJAY SOCIETY, INC.,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(CA-90-1100-3)

Argued: January 30, 1998

Decided: April 23, 1998

Before WILLIAMS and MICHAEL, Circuit Judges, and KISER,
Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Senior Judge Kiser wrote the opinion,
in which Judge Williams and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** J. Lester Kaney, COBB, COLE & BELL, Daytona Beach,
Florida; Herbert L. Allen, ALLEN, DYER, DOPPELT, FRANJOLA

& MILBRATH, P.A., Orlando, Florida, for Appellants. Steve A. Matthews, SINKLER & BOYD, P.A., Columbia, South Carolina, for Appellee. **ON BRIEF:** Robert O. Meriwether, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Columbia, South Carolina, for Appellee.

_____

**OPINION**

KISER, Senior District Judge:

Mr. Norton Baskin (Baskin) is the personal representative of the estate of his late wife, Mrs. Marjorie Kinnan Rawlings Baskin (Rawlings). In Count I of the Second Amended Complaint, Baskin and the University of Florida Foundation (Foundation) (formerly known as the University of Florida Endowment Corporation) seek to recover from The Seajay Society, Inc. (Seajay) physical possession of certain documents which appellants assert are assets of the Rawlings estate. In Count II, the Foundation seeks damages and injunctive relief for Seajay's alleged violation of, and alleged threats to continue violating, its copyright.[1]

Senior Judge Perry tried this case without a jury on September 5 and 6, 1991. After the trial, post-trial briefs, and closing arguments, the lower court, on October 1, 1992, entered judgment for Seajay as to Counts I and II, but did not render a decision on the counterclaim.[2]

_____

[1] It is important to note the distinction between the physical ownership of documents, and the ownership of the literary rights in those documents, the later being the copyright. Under 17 U.S.C.A. § 202 (West 1996), the physical document and the copyright are subject to separate transfer. Count I concerns the right to physical possession of the documents themselves, while Count II concerns the ownership of the literary rights in the documents. Seajay concedes that the Foundation owns the copyright to Ms. Rawlings' letters and papers, however, it contends that it did not infringe upon those literary rights.

[2] Seajay filed a counterclaim seeking a declaration that their uses of the contested documents prior to February 21, 1991 did not constitute publication sufficient to warrant an extension of the Foundation's copyright under 17 U.S.C.A. § 303. Appellants apparently do not appeal this ruling.

The district court also did not file findings of facts or conclusions of law at that time. Baskin and the Foundation noticed an appeal to this Court on October 30, 1992. This Court, however, dismissed the appeal without prejudice because of the district court's failure to address the counterclaim or include findings of fact and conclusions of law.

On February 5, 1997, after reopening the record, receiving additional evidence on Count II, and hearing renewed closing arguments, the district court found for Seajay as to Counts I and II and the counterclaim. The district court also filed its findings of fact and conclusions of law. That decision is now before this Court on appeal.

I. FACTS

Rawlings died on December 14, 1953 in St. John's County, Florida. She was the noted author of books such as Sojourner, Cross Creek, and The Yearling, which won the 1939 Pulitzer Prize.

In her will, Rawlings designated Baskin and the Foundation as co-executors of her estate. She also designated one of her closest friends, Ms. Julia Scribner Bigham (Bigham) as literary executrix of her estate. Bigham was the daughter of publisher Charles Scribner, whose company, Charles Scribner's Sons Publishers (Scribner Publishing), published all of Rawlings' works.

On January 27, 1954, the County Judge's Court for St. John's County, Florida appointed Baskin as the sole executor of Rawlings' estate. The probate court never appointed the Foundation as an executor. Likewise, the probate court never appointed Bigham as literary executrix, or as any other fiduciary. Bigham acted in the capacity as literary executrix, however, under the auspices of Baskin, from 1953 until her death on October 24, 1961.[3]

Rawlings' will left immediate custody of "all manuscripts, all notes, all correspondence, and all literary property of any kind" to

_____

[3] The term "literary executrix" is somewhat misleading because Bigham never qualified as a fiduciary in any capacity. Her legal status seems to have been that of an advisor to the executor, Baskin.

Bigham, in her role as literary executrix. Bigham had the power to destroy any of the "notes, manuscripts or correspondence" she believed should be destroyed. She also had the power to determine which materials would be published. Bigham could keep the literary works as long as she wanted, then she was to turn them over to the University of Florida Library. Any income from these literary materials was to be held in trust by the Foundation, along with the remainder of Rawlings' property.

Acting in her role as literary executrix, Bigham collected Rawlings' correspondence, papers, manuscripts, and other materials from Baskin. Bigham also obtained some of Rawlings' materials from Scribner Publishing. At no time did Baskin, the only court appointed fiduciary, ever request an inventory of the materials collected by Bigham.

Bigham scrupulously performed her duties as literary executrix. During the remainder of her life, she wrote an introduction to and posthumously published The Secret River, and then directed the original manuscript be sent to the University of Florida Library; she posthumously published The Marjorie Rawlings Reader , and then returned the typescript and original materials to Scribner Publishing; she worked to ensure that any works retained by Scribner Publishing were later sent to the University of Florida Library; and she transferred numerous other documents to the University of Florida Library. After Bigham's death in 1961, Baskin did not ask any one else to assume the role of literary executor. Instead, as executor of the estate, he assumed that role.

Baskin was not as conscientious as Bigham in performing the duties of literary executor. He admitted that he was aware that Bigham had a significant number of Rawlings' documents at the time of her death, yet he never asked Bigham's family to return any of those documents to the Rawlings estate. He stated that he believed the documents were under consideration for publication by Scribner Publishing, but admits that he knew the documents were at Bigham's residence. In any event, he failed to confirm whether or not the documents were part of the Rawlings estate and whether or not they were being considered for publication by Scribner Publishing. Four years after Bigham's death on October 24, 1961, the Florida probate

4

court closed administration of Rawlings' estate with Baskin still having failed to clarify the status of those documents.

The documents remained stored at the residence of Bigham's widower in two boxes which were labeled "MKR letters and papers." In 1987, Bigham's widower was moving from the residence, so he and his children decided to dispose of the contents of the boxes. Ms. Ann Hutchins, Bigham's daughter, contacted Mr. Glenn Horowitz, a nationally known dealer of rare books and literary and historical manuscripts, to help them sell the material. Horowitz and his staff cataloged the contents of the two boxes as follows:

> 1. Letters written from Rawlings to Bigham from 1939 to 1953;
>
> 2. Correspondence of Bigham in connection with her duties as literary executrix;
>
> 3. Publisher's typescript with editor's blue-penciled emendations of Rawlings' The Secret River (a children's book posthumously published by Bigham);
>
> 4. Miscellaneous original typescripts, manuscripts, and story ideas written by Rawlings, including her first unpublished novel, Blood of My Blood;
>
> 5. Letters written from Bigham to Rawlings from 1940 to 1953.[4]

After compiling the catalog of documents, Horowitz contacted Dr. James Meriwether, an officer of Seajay, about the letters. Seajay is a small, non-profit organization dedicated to enhancing public aware-

_____

[4] Appellants allege in Count I that certain of the documents in categories 3 and 4 were owned by Rawlings at the time of her death, and passed to Bigham solely in her role as literary executrix. They claim that upon Bigham's death, rightful possession of those documents passed to Baskin as the administrator of the estate. Their claim covers a total of 12 documents from those two categories, including Rawlings' first unpublished novel Blood of My Blood.

5

ness of, and interest in, unduly neglected aspects of South Carolina and southern culture. After negotiations, Seajay obtained the documents by partial purchase and partial gift from the Bigham estate.

After purchasing the documents, Seajay made one whole copy of Blood Of My Blood for Dr. Anne Blythe (Blythe). Blood of My Blood is Rawlings' first novel; it was written in 1928, is 183 pages long, and has never been published. Blythe, also an officer of Seajay, used the copy in preparing a critical review of Blood of My Blood. Seajay made the copy so that Blythe would not damage the fragile original during her analysis. Seajay also made a partial copy [5] of the manuscript which it sent to the Rare Books Room at the University of Florida Library. Seajay made this copy for the dual purpose of allowing Baskin, or his designee, to view and authenticate it, and allowing the University of Florida Press to view it and determine if it was worthy of publication. Access to the copy was restricted, and photocopying it was prohibited.[6] The University of Florida Library eventually returned its copy to Seajay.

In April of 1988, Blythe orally presented her critical analysis of Blood of My Blood to a symposium of the Marjorie Kinnan Rawlings Society at the University of Florida. Between 150 and 200 members of Rawlings Society attended the symposium. In the presentation, Blythe quoted approximately 2,464 words from the text of Blood of My Blood, or four to six percent of the total text. Blythe submitted a hard copy of her paper for publication with the Marjorie Kinnan Rawlings Society Journal. She also hoped to publish an edited version of her presentation as an introduction to Blood of My Blood, which the University of Florida Press wanted to publish in its entirety. Blythe was aware that neither the Society's Symposium nor the University of Florida Press would be able to publish her article, much less Blood of My Blood, without first obtaining the permission of the copyright holder. Neither publisher was able to secure the necessary

_____

[5] This copy included all but six pages of the original.

[6] The Foundation used a copy of Blood of My Blood obtained in violation of this restriction to register its copyright on June 13, 1990.

6

permission, thus neither <u>Blood of My Blood</u> nor Blythe's paper has ever been published.**7**

On Februaury 9, 1990, the St. John's County, Florida probate court re-opened administration of Rawlings' estate, allowing Baskin to bring this suit on behalf of the estate. Baskin then filed the original Complaint, in which he sought recovery of the documents from Seajay, on May 18, 1990. He amended his Complaint on September 21, 1990 to include the Foundation's claim for damages and injunctive relief under the Copyright Act. At trial, on September 6, 1991, Baskin and the Foundation amended the Amended Complaint so that the Foundation could also assert an action for recovery of the documents under Count I. On February 5, 1997, the district court entered final judgment in favor of Seajay as to Counts I and II and its counterclaim.

II. <u>POSSESSION OF THE DOCUMENTS</u>

As to Count I of the Second Amended Complaint, the lower court made three alternative holdings which supported its finding for Seajay. First, it held that Baskin's claim in Count I was barred by South Carolina's six year statute of limitations, S.C. Code Ann. § 15-3-530(4) (Law. Co-op. 1997), and that the Foundation had no independent claim to a possessory interest in the contested documents. Second, the lower court held that even if Baskin and the Foundation had a possessory interest in the documents, Seajay's title in them was protected as a good faith purchaser for value from a dealer in goods of the kind. S.C. Code Ann. § 36-2-403(2). Third, the district court addressed the merits of the case, and held that Baskin and the Foundation failed to prove that either had a right to possession of the documents. The appellants attack each one of these holdings. In affirming

_____

**7** In Count II, the Foundation claims that the copy of <u>Blood of My Blood</u> made for Blythe; the copy made for the University of Florida Library; and the paper written and presented by Blythe, which quoted and substantially paraphrased <u>Blood of My Blood</u>, constitute copyright infringement. The Foundation also claims that Seajay has threatened to make additional infringing copies of <u>Blood of My Blood</u>. According to the Foundation, this alleged threat justifies the injunctive relief sought under 17 U.S.C.A. § 502.

the decision of the lower court, we need only address whether or not Baskin's claim is barred by the relevant statute of limitations.**8**

South Carolina Code § 15-3-530(4) provides a six year limitations period for "an action for the specific recovery of personal property." Such an action must be commenced within six years after the claimant "knew or by the exercise of reasonable diligence should have known that he had a cause of action." S.C. Code Ann. § 15-3-535; see also Campus Sweater and Sportswear Co. v. M.B. Kahn Constr. Co., 515 F. Supp. 64, 79 (D.S.C. 1979) (holding that"discovery rule" in § 15-3-535 applies to claims under § 15-3 530(4)), aff'd, 644 F.2d 877 (4th Cir. 1981). The lower court held that Baskin, in the exercise of reasonable diligence, should have known that he had a cause of action to recover the contested documents on October 24, 1961, the date of Bigham's death.

The determination that Baskin "knew or by the exercise of reasonable diligence should have known that he had a cause of action" almost thirty years before bringing his action is a finding of fact. Thus, it is subject to a "clearly erroneous" standard of review. See Fed. R. Civ. P. 52.

The lower court made its determination by relying upon fifteen subsidiary facts drawn solely from an examination of Baskin's own deposition testimony and interrogatory responses. **9** The most relevant of those facts to this Court are that: (i) Bigham worked, not as a fiduciary under a court order, but under the auspices of Baskin, the sole court appointed fiduciary of the Rawlings estate; (ii) Baskin delivered numerous documents to Bigham following Rawlings' death and knew that Bigham collected documents from Scribner Publishing, as well;

_____

**8** As noted, the lower court held that the Foundation did not have a possessory interest in the contested documents. Appellants have not appealed this decision. Indeed, their entire appeal as to Count I is directed at Baskin's recovery of the contested documents. Accordingly, appellants have waived any claim by the Foundation for possession of the contested documents. Therefore, we need only discuss whether Baskin has a viable claim under Count I.

**9** Baskin was unable to testify at the trial due to his health. His deposition testimony and interrogatory responses were admitted into evidence.

8

(iii) Baskin knew that Bigham had some of Rawlings' documents at her home when she died in October of 1961; (iv) as executor of the estate, Baskin assumed the role of literary executor upon Bigham's death;[10] (v) despite his knowledge that Bigham had some of Rawlings' documents in her possession at the time of her death and his understanding that the documents were now his responsibility as executor of the estate, Baskin did not request to review the documents to determine if they were the property of the estate, nor did he ask that the documents be returned to his possession; and (vi) Baskin never requested the return of the documents from 1961 to 1965, while administration of Rawlings' estate remained open. [11]

The evidentiary support for the district court's factual finding is more than sufficient to withstand review under a clearly erroneous standard. We concur with the district court that even if the contested documents were part of the Rawlings' estate, Baskin's cause of action to recover the documents arose in 1961 and expired, under South Carolina law, in 1967. Thus, his attempt to now recover possession of the documents is time barred. Because Baskin's claim is time barred, and because the Foundation has waived its claim to possession of the documents, we affirm the district court's decision as to Count I of the Second Amended Complaint.

III. <u>COPYRIGHT INFRINGEMENT</u>

In Count II of the Second Amended Complaint, the Foundation seeks damages and an injunction for the past and prospective infringement of its copyright in <u>Blood of My Blood</u>. [12] Specifically, the Foun-

_____

[10] Baskin not only admitted this in his interrogatory responses and deposition testimony, but in paragraph 14 of the Second Amended Complaint, Baskin alleged that, upon Bigham's failure to complete her duties as literary executrix, the duty passed to him as personal representative of the estate.

[11] In paragraph 15 of the Second Amended Complaint, Baskin alleges that as personal representative of Rawlings' estate, the right to possession of all the estate's personal property belonged to him pending the completion of administration of the estate, yet he did not attempt to recover these documents while administration of the estate remained open from 1961 until 1965.

[12] Count II is a claim exclusively put forward by the Foundation, as the sole owner of the copyright.

dation seeks damages for the entire copy of Blood of My Blood provided by Seajay to Blythe; the partial copy provided by Seajay to the University of Florida Library; and for Blythe's oral presentation, which quoted and paraphrased Blood of My Blood , and her attempts to publish that presentation. The Foundation seeks the injunction because of alleged threats made by Seajay to disseminate copies of Blood of My Blood to other archives which maintain collections of Rawlings' works.

The district court held that the allegedly infringing copies were permissible under the fair use exception of 17 U.S.C.A.§ 107. According to the lower court, Blythe's paper constituted a scholarly appraisal of Blood of My Blood from a literary and biographical perspective, for which extensive quoting from a copyrighted work is permissible. As for her attempts to publish the scholarly criticism, the lower court found that she understood that the paper would not be published unless the publisher first obtained the permission of the copyright holder, and, in fact, her paper never was published. The lower court found that the complete copy of Blood of My Blood given to Blythe was permissible since it was provided to prevent damage to the original manuscript during the course of her scholarly work. Regarding the partial copy sent to the University of Florida Library, the district court found that it was made for the dual purposes of allowing Baskin, or his designee, to authenticate it and to allow the University of Florida Press to determine whether it was worthy of publication. The court also decided that Seajay knew that no publication of the novel would take place without first obtaining the permission of the copyright holder.

The claim for injunctive relief is based upon a letter written by Seajay's counsel on September 13, 1989, which the Foundation claims threatened the dissemination of additional copies of Blood of My Blood in violation of the Foundation's copyright. The lower court decided that the alleged threat did not constitute a threat at all. Rather, the court found that the letter constituted a request by Seajay for permission to copy Blood of My Blood.

A. Claim for Damages

Seajay concedes that the copies it made of Blood of My Blood constitute copyright infringement, unless they are protected by an excep-

10

tion to the Copyright Act. Seajay argues that its copies are protected by the fair use exception to copyright infringement found at 17 U.S.C.A. § 107.

"Fair use is a mixed question of law and fact." <u>Harper & Row, Publishers, Inc. v. Nation Enterprises</u>, 471 U.S. 539, 560 (1985). Thus, we review the district court's legal conclusions <u>de novo</u>. <u>American Geophysical Union v. Texaco Inc.</u>, 60 F.3d 913, 918 (2d Cir. 1994). The district court's subsidiary findings of fact are, of course, subject to a clearly erroneous standard of review. <u>Id</u>.

"Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of the copyright," <u>Harper & Row</u>, 471 U.S. at 546; 17 U.S.C.A. § 106 (West 1996 & Supp. 1997), including the "right of first publication." <u>Salinger v. Random House, Inc.</u>, 811 F.2d 90, 95 (2d Cir.), <u>cert. denied</u>, 484 U.S. 890 (1987). Section 107 of the Act provides an exception to the copyright holder's exclusive rights: "the fair use of a copyrighted work . . . is not an infringement of copy-right." 17 U.S.C.A. § 107. "Any individual may reproduce a copy-righted work for a `fair use'; the copyright owner does not possess the exclusive right to such a use." <u>Sony Corp. of America v. Universal City Studios, Inc.</u>, 464 U.S. 417, 433 (1984). This fair use exception permits photocopying of copyrighted material "for purposes such as criticism, comment, news reporting, teaching (including multiple cop-ies for classroom use), scholarship, or research."[13] 17 U.S.C.A. § 107.

Fair use is an "equitable rule of reason," for which "no generally applicable definition is possible." H.R. Rep. No. 94-1476, at 65 (1976). The statute requires a "case-by-case analysis" to determine whether a particular use is fair. <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 577 (1994). While Congress has "eschewed a rigid, bright-line approach to fair use," <u>Sony</u>, 464 U.S. at 448 n.31, it has set forth four factors to guide a court when deciding whether a partic-ular use is fair: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educa-tional purposes; (2) the nature of the copyrighted work; (3) the

_____

[13] This list of permissible uses is not exhaustive and is not intended to single out any particular use as presumptively fair. <u>Harper & Row</u>, 471 U.S. at 561.

11

amount and substantiality of the portion used in relation to the copy-righted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C.A. § 107. These factors are not exclusive, but are "particularly relevant to the fair use question." Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1260 (2d Cir. 1986), cert. denied, 481 U.S. 1059 (1987). These four statutory factors may not be "treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." Campbell, 510 U.S. at 578.

i. Character and Purpose

The first factor to be considered is the purpose and character of the challenged use, including whether such use is of a commercial nature or is for non-profit educational purposes. 17 U.S.C.A. § 107(1).

a. Character

"The enquiry here may be guided by the examples given in the pre-amble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like . . . . The central purpose of this inquiry is to see . . . whether the new work merely `supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative. Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. . . . [T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Campbell, 510 U.S. at 578-79 (citations omitted).

We find that the district court was correct in characterizing Blythe's paper as "a scholarly appraisal of Blood of My Blood from a biographical and literary perspective." Baskin v. Seajay Society, Inc., No. 3:90-1100-0, at 30 (D.S.C. February 5, 1997). A reading of Blythe's paper clearly indicates that she attempted to shed light on Rawlings' development as a young author, review the quality of Blood of My Blood, and comment on the relationship between Rawl-

12

ings and her mother. The "further purpose" and "different character" of Blythe's work make it transformative, rather than an attempt to merely supersede Blood of My Blood.

While it does quote from and paraphrase substantially Blood of My Blood, its purpose is to criticize and comment on Ms. Rawlings' earliest work. Thus, Blythe's transformative paper fits within several of the permissible uses enumerated in § 107; it has productive uses as criticism, comment, scholarship, and literary research. While this finding is not determinative, it is one factor supporting the district court's finding of a fair use. See Harper & Row , 471 U.S. at 561; Wright v. Warner Books, Inc., 953 F.2d 731, 736 (2d Cir. 1991) ("[T]here is a strong presumption that factor one favors the defendant if an allegedly infringing work fits the description of uses described in section 107.").

b. Purpose

The Foundation contends that Blythe was partially motivated by prospective royalties from the publication of her scholarly criticism, and that such commercial motivation negates any scholarly motivation. Under the fair use doctrine, commercial use of an allegedly infringing work is more disfavored than noncommercial use. See Sony, 464 U.S. at 449. Nonetheless, while there is evidence that Blythe hoped to profit from her paper, this factor alone is not dispositive of the fair use issue. "[T]hough it is a significant factor, whether the profit element of the fair use calculus affects the ultimate determination of whether there is a fair use depends on the totality of the factors considered; it is not itself controlling." Rogers v. Koons, 960 F.2d 301, 309 (2d Cir.) (citation omitted), cert. denied, 506 U.S. 934 (1992).**14**

_____

**14** "If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship and research, since these activities are generally conducted for profit in this country. Campbell, 510 U.S. at 584 (citation and internal quotation omitted) (emphasis added).

13

"The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471 U.S. at 562. Courts should also "consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially." Sega Enters. Ltd. v. Accolade, Inc. , 977 F.2d 1510, 1523 (9th Cir.1992). This public benefit typically involves"the development of art, science, and industry." Rosemont Enters., Inc. v. Random House, Inc., 366 F.2d 303, 307 (2d Cir. 1966) (citation omitted), cert. denied, 385 U.S. 1009 (1967).

First, there is no evidence of an exploitative motive in any of the allegedly infringing uses. There was no commercial motive, much less an exploitative motive, in the complete copy provided to Blythe. Her copy was provided in pursuit of her scholarly objective and only because she might harm the fragile, seventy year old original manuscript during her analysis. There also was no exploitative motive underlying the University of Florida Library's partial copy. One of Seajay's motivations for delivering the copy was to authenticate it as a work of Ms. Rawlings. Clearly, this was non-commercial and non-exploitative. The other purpose behind the copy was to assess the worthiness of Blood of My Blood for publication. While this was potentially a commercial motivation, there was no risk of exploitation since Seajay understood that such publication could not take place without the permission of the copyright holder.

As for Dr. Blythe's paper, there was a potential commercial motivation in that Dr. Blythe may have received royalties if her paper were published, however, there was no attempt to exploit the Foundation. The paper was only to be published if the necessary permission were obtained from the copyright holder. Since such permission was not obtained, the paper was not published and no royalties were ever received.

Second, all of Seajay's uses unquestionably served the "public benefit" and "the development of art." The Blythe copy was provided by Seajay to protect the fragile original from damage during a scholarly literary criticism of the work. The Library copy was provided for authentication and determination of worthiness for publication, publi-

14

cation which would not take place without the permission of the copyright holder. As noted above, the Blythe paper was for the purposes of scholarship, criticism, comment, and literary research. All of these purposes serve the public benefit and aid in the development of the arts.

Thus, in general, the challenged uses of Blood of My Blood were for noncommercial, educational purposes. To the extent there was any commercial motivation behind the uses, there was no attempt to exploit Blood of My Blood to the detriment of the Foundation.

A subsidiary enquiry to the commercial/non-commercial distinction is whether the allegedly infringing uses "supplant[ed] the copyright holder's commercially valuable right of first publication." Harper & Row, 471 U.S. at 562. In this case, Seajay's uses of Blood of My Blood had neither the "intended purpose," nor the "incidental effect," of usurping the Foundation's right of first publication. See id. First, there is no evidence that Seajay intended to publish Blood of My Blood before the Foundation. In fact, all of the evidence indicates that Seajay sought the Foundation's approval to publish the work, and that when such approval was not forthcoming, it did not publish Blood of My Blood.**15** Second, Seajay's uses did not have the effect of supplanting a potential publication of Blood of My Blood by the Foundation. Blythe's copy was seen only by Dr. Blythe as she performed her scholarly review. The Library's copy was seen only by a representative of Baskin and representatives of the University of Florida Press. Blythe's paper was presented only to between 150 and 200 members of the Rawlings Society, the editor of the Society's Symposium, and an editor for University of Florida Press. None of these disseminations of Blood of My Blood was sufficient to support a finding that Seajay supplanted the Foundations's right of first publication.

For the aforementioned reasons, the purpose and character of Seajay's allegedly infringing uses weigh heavily in favor of finding the uses fair under 17 U.S.C.A. § 107.

_____

**15** In this case, there was no attempt by the defendant to market the copyrighted work ahead of an imminent publication by the copyright holder, as there was in Harper & Row.

15

ii. <u>Nature of Copyrighted Work</u>

The second statutory consideration is the nature of the copyrighted work. 17 U.S.C.A. § 107(2). "This factor calls for recognition that some works are closer to the core of intended protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." <u>Campbell</u>, 510 U.S. at 586.

Creative works and unpublished works are closer to the core of works protected by the Copyright Act. "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy. . . . [and] [t]he scope of fair use is also narrower with respect to unpublished works." <u>Harper & Row</u>, 471 U.S. at 563, 564. Because <u>Blood of My Blood</u> is a creative, unpublished work, the second enquiry weighs in favor of finding Seajay's use unfair.**16**

Appellant argues that the unpublished nature of the <u>Blood of My Blood</u> requires us to reverse the district court. Indeed the Supreme Court stated that "[u]nder ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." <u>Harper & Row</u>, 471 U.S. at 555. In 1992, however, Congress amended § 107 to state that: "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." 17 U.S.C.A. § 107.**17** Thus, while the fact that <u>Blood of My Blood</u> was

_____

**16** Even though <u>Blood of My Blood</u> can be characterized as autobiographical, it is still a work of creative expression rather than a presentation of information.

**17** Appellants contend that the 1992 amendment to § 107 does not apply in this case because the action commenced in 1990 and the district court reached its initial decision in 1991. We disagree. The district court reopened the case for argument in 1996, received additional evidence as to Count II at that time, and entered its findings of fact and conclusions of law in 1997. Thus, the law at the time of the district court's decision included the 1992 amendment. In any event, prior to the 1992 amendment, the Supreme Court's statement in <u>Harper & Row</u> did not require a finding of unfair use; it merely militated against a finding of fair use. We are of the opinion that the district court's decision should be upheld whether or not the 1992 amendments apply to this case.

16

unpublished militates against a finding of "fair use," it does not fore-
close a finding that Seajay's use was fair.

Appellant also urges reversal because the dissemination by Seajay
denies the Foundation its power to decide not to publish <u>Blood of My
Blood</u> at all. <u>Harper & Row</u> clearly recognizes that "[t]he right of first
publication encompasses . . . the choice whether to publish at all . . . ."
471 U.S. at 564. The Foundation is correct in its statement that usurp-
ing the copyright holder's privilege to determine whether or not to
publish <u>Blood of My Blood</u> would favor a finding of unfair use. This
argument presupposes, however, that the purpose or effect of the
allegedly infringing uses was to supplant the Foundation's right to
publish <u>Blood of My Blood</u>. As discussed above, we have found that
neither the purpose nor the effect of any of the challenged copies
amounted to a first publication of <u>Blood of My Blood</u>. Thus, we hold
that while the unpublished nature of <u>Blood of My Blood</u> weighs
against a finding of fair use, the allegedly infringing copies have not
stripped from the Foundation its right to determine whether or not to
publish Rawlings' first work at all.

For the aforementioned reasons, the nature of the copyrighted work
weighs in favor of finding Seajay's use to have been unfair under 17
U.S.C.A. § 107.

iii. <u>Amount and Substantiality of Copied Portion</u>

The third statutory factor addresses the amount and substantiality
of the portion copied by the alleged infringer in relation to the copy-
righted work as a whole. 17 U.S.C.A. §107(3)."[T]his factor calls for
thought not only about the quantity of the materials used, but about
their quality and importance, too." <u>Campbell</u> , 510 U.S. at 587. Thus,
this factor has favored copyright holders where a significant percent-
age of the copyrighted work was copied, or where the percentage was
not great, but the copied portion essentially was the "heart" of the
copyrighted work. <u>Wright</u>, 953 F.2d at 738 (citations and internal
quotations omitted).

a. Quality

No evidence was admitted as to the value of the copied material in
relation to the copyrighted work as a whole. We could presume that

because Blythe chose to quote it, the material copied necessarily must be the "heart of the work," however, we decline to do so. Obviously, the quoted material is of significant value, or it would not have been quoted. All quoted material is of significant value, but it cannot be said to be the "heart of the work" or the fair use doctrine would be destroyed. See Religious Technology Center v. Lerma, 908 F. Supp. 1362, 1367 (E.D. Va. 1997). If all quoted material were deemed significant enough to preclude a fair use just because it was significant enough to be quoted, no one could ever quote copyrighted material without fear of being sued for infringement. Thus, we find that the quoted portions are undoubtedly significant, but fall short of being the "heart of the work," and thus weighing in favor of a finding of unfair use.

b. Quantity

"There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use." Maxtone-Graham, 803 F.2d at 1263. In analyzing this factor, we must consider material copied from the copyrighted work, whether it has been quoted verbatim or paraphrased. Salinger v. Random House, 811 F.2d 90, 97 (2d Cir. 1987). Copying an entire work weighs against finding a fair use, Advanced Computer Servs. v. Mai Sys. Corp., 845 F. Supp. 356, 365 (E.D. Va. 1994), however, it does not preclude a finding of fair use. Id. at 366 (citations omitted). "[T]he extent of permissible copying varies with the purpose and character of the use." Campbell, 510 U.S. at 586-87.**18**

Obviously, the copies of Blood of My Blood provided to Blythe and the University of Florida Library were qualitatively and quantitatively substantial. Nonetheless, when the extent of the copying is considered with the purpose and character of the uses, the amount and substance of the copies are justified. See Campbell, 510 U.S. at 586-87. In order for Blythe to perform her scholarly criticism of the novel, she obviously needed access to either the original or an entire copy. Similarly,

_____

**18** The more material copied directly from a copyrighted work tends to show a lack of transformative character under the first factor and a greater likelihood of market harm under the fourth factor. See Campbell, 510 U.S. at 587-88.

18

in order for the Library to authenticate Blood of My Blood as being Rawlings' work, to determine whether the work was worthy for publication, and to obtain the necessary permission from the copyright holder, it too needed either the original or a nearly complete copy. It would severely restrict scholarly pursuit, and inhibit the purposes of the Copyright Act, if a fragile original could not be copied to facilitate literary criticism. Thus, we find that the amount and substantiality of the portion of Blood of My Blood copied for Blythe and the Library did not exceed the amount necessary to accomplish these legitimate purposes. See Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors, 786 F.2d 1400, 1409 (9th Cir. 1986).

As to Blythe's paper, she quoted between four and six percent of Blood of My Blood. In addition, she paraphrased substantially from the work. As with the copies provided to Blythe and the Library, the propriety of the amount quoted and paraphrased by Blythe must be analyzed in consideration of the purpose and character of the allegedly infringing use. Here, Blythe was performing a scholarly criticism of Rawlings' initial work. It seems apparent that a scholarly criticism of a book will require the critic to quote and paraphrase from the work it is analyzing. See Supermarket of Homes , 786 F.2d at 1408 ("A common type of `fair use' is quotation of a passage in a book review."); Robert Stigwood Group Ltd. v. O'Reilly, 346 F. Supp. 376, 385 (D. Conn. 1972) (recognizing that critical review of another's work can be a fair use and that critics may quote extensively from the copyrighted work "in order to comment effectively"). Additionally, as the district court held, the amount quoted by Blythe is well within allowable limits as found by other courts. See New Era Publications Int'l, ApS v. Carol Publ'g Group, 904 F.2d 152, 158 (2d Cir.) (fair use defense available where defendant quoted minuscule amount from 25 works, between 5 and 6 percent of 12 works and 8 percent or more of 11 short works), cert. denied, 498 U.S. 921 (1990); Maxtone-Graham, 803 F.2d at 1263 (quoting 4.3 percent of copyrighted work not incompatible with finding of fair use). Thus, we find that no more of the text was quoted or paraphrased than was necessary for Blythe to adequately criticize and comment upon Blood of My Blood.

For the aforementioned reasons, the amount and substantiality of the portion copied by Seajay weigh in favor of finding the uses fair under 17 U.S.C.A. § 107.

19

iv. Market Effect

The final statutory enquiry considers the effect the allegedly infringing use has upon the market for, or value of, the copyrighted work. 17 U.S.C.A. § 107(4). This fourth factor "is undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566.

a. Impair Marketability

A use that does not materially impair the marketability of the copyrighted work generally will be deemed fair. Advanced Computer Services, 845 F. Supp. at 366 (citing Sony , 464 U.S. at 450-51; Harper & Row, 471 U.S. at 566-67; N.A.D.A. Servs. Corp. v. Business Data of Virginia, Inc., 651 F. Supp. 44, 48 (E.D. Va. 1986)). The only evidence presented at trial as to the market effect of the allegedly infringing uses was that, despite the Blythe presentation and the copies to Blythe and the Library, the University of Florida Press still wanted to publish Blood of My Blood. Based on this evidence, the district court held that the uses made by Seajay did not diminish the potential market for, or value of, Blood of My Blood.

This finding of fact was not clearly erroneous. The copy provided to Blythe was seen only by Blythe; the copy provided to the University of Florida was seen only by Mr. Roger Tarr, an associate of Baskin, and representatives of University of Florida Press; the presentation by Blythe was seen by between 150 and 200 members of the Marjorie Kinnan Rawlings Society, the editor of the Society's Symposium, and an editor for the University Press. Thus, it is reasonable for the district court to have concluded that the allegedly infringing activities did not have a negative impact on the market for, or value of, Blood of My Blood. In fact, it is likely that Blythe's presentation stimulated interest in Blood of My Blood among the Society's members and may actually have increased demand for it. See Maxtone-Graham, 803 F.2d at 1264.

b. Market Substitute

Another key element of the fourth enquiry is whether the allegedly infringing work is a market substitute for the copyrighted work. As

20

the Supreme Court stated, "the role of the courts in determining fair use is to distinguish between `[b]iting criticism [that merely] suppresses demand [and] copyright infringement[, which] usurps it.'" Campbell, 510 U.S. at 592 (quoting Fisher v. Dees, 794 F.2d 432, 438 (9th Cir. 1986)). The fair use doctrine protects against a republication which offers the copyrighted work "in a secondary packaging," where "potential customers, having read the secondary work, will no longer be inclined to purchase again something they have already read." New Era Publications Int'l, ApS v. Henry Holt & Co., Inc., 695 F. Supp. 1493 (S.D.N.Y. 1988), aff'd, 873 F.2d 576 (2d Cir. 1989), cert. denied, 493 U.S. 1094 (1990). The doctrine does not protect against criticism which may have an adverse market effect. Id.

This analysis harkens back to our discussion of § 107(1). As we held then, Blythe's paper was transformative; it did not amount to mere duplication of the original, and did not have the purpose or effect of supplanting the copyrighted work. It did not serve as a market replacement for Blood of My Blood, rather it served as a criticism of and comment about Blood of My Blood. This holding is reinforced by the University of Florida Press' willingness to publish Blood of My Blood despite Blythe's presentation. Accordingly, we hold that since Blood of My Blood and Blythe's criticism of Blood of My Blood serve different market functions, Blythe's paper is not a market substitute for the original work.**19**

c. Derivative Markets

A final element of the fourth factor is the impact the allegedly infringing uses may have on the market for derivatives of the copyrighted work. Harper & Row, 471 U.S. at 568. The market for potential derivatives includes those uses that the copyright holder of the original work would develop or license others to develop. Campbell, 510 U.S. at 592. As the Supreme Court declared, however, "there is

_____

**19** We find that, even if widespread, Harper & Row, 471 U.S. at 568, Blythe's presentation would not have superseded Blood of My Blood's place in the market. As a scholarly criticism, Blythe's paper is of a different character and delivers a different message than Blood of My Blood. Thus, it could not be a market substitute for or a competitor with Blood of My Blood.

21

no protectible derivative market for criticism." Id. If there were a protectible derivative market for critical works, copyright holders would only license to those who would render favorable comment. The copyright holder cannot control the dissemination of criticism. See New Era, 695 F. Supp. at 1523 (fair use protection is not "accorded only to favorable critics"). Thus, Seajay's allegedly infringing uses could not impact the market for derivatives of Blood of My Blood.

For the aforementioned reasons, the effect Seajay's uses have on the market for, or value of, Blood of My Blood weighs in favor of finding the uses fair under 17 U.S.C.A. § 107.

v. Aggregation of Four Factors

An analysis of the four statutory factors leads us to agree with the district court that Seajay's uses of the original manuscript of Blood of My Blood were permissible under the "fair use" exception to copyright infringement.

B. Claim for Injunctive Relief

The district court held that the alleged threats of illegal duplication contained in the letter of September 13, 1989 did not constitute threats at all. Instead, the lower court held that the letter merely requested permission to publish Blood of My Blood. The court noted that letters dated January 29, 1990; July 3, 1990; and August 16, 1990 supported its factual determination. A review of those letters shows ample support for the district court's factual finding. Accordingly, there was no threat of future dissemination of Blood of My Blood, and the district court properly denied the Foundation's request for an injunction.

IV. CONCLUSION

For the reasons contained herein, we affirm the judgment of the district court.

AFFIRMED

22