PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FREDERICK E. BOUCHAT,

       *Plaintiff-Appellant,*

       v.

BALTIMORE RAVENS LIMITED
PARTNERSHIP; NATIONAL FOOTBALL
LEAGUE; NFL PRODUCTIONS LLC,
d/b/a NFL Films, Incorporated, a
subsidiary of NFL Ventures L.P.,
1 NFL Plaza, Mt. Laurel, New
Jersey 08054,

       *Defendants-Appellees,*

       and

NFL FILMS, INCORPORATED; THE
BALTIMORE SUN COMPANY,

       *Defendants.*

No. 08-2381

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(1:08-cv-00397-MJG)

Argued: December 4, 2009

Decided: September 2, 2010

Before NIEMEYER, MICHAEL, and GREGORY,
Circuit Judges.

Reversed and remanded in part; affirmed in part by published opinion. Judge Michael wrote the opinion, in which Judge Gregory joined. Judge Niemeyer wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Howard J. Schulman, SCHULMAN & KAUF-MAN, LLC, Baltimore, Maryland, for Appellant. Robert Lloyd Raskopf, QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP, New York, New York, for Appellees. **ON BRIEF:** Daniel P. Doty, SCHULMAN & KAUFMAN, LLC, Baltimore, Maryland, for Appellant. Mark D. Gately, HOGAN & HARTSON, LLP, Baltimore, Maryland; Sanford I. Weisburst, QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP, New York, New York, for Appellees.

---

**OPINION**

MICHAEL, Circuit Judge:

For the fourth time we consider on appeal an aspect of Frederick E. Bouchat's copyright infringement cause against the Baltimore Ravens football organization and National Football League entities for their unauthorized copying of a Ravens team logo, drawn by Bouchat, that was used for three seasons as the team's official symbol. This appeal arises from an action Bouchat filed to enjoin defendants' depictions of the copyrighted logo in season highlight films and in the Ravens corporate lobby. The district court found that defendants' depictions of the logo were a fair use and entered judgment against Bouchat. We reverse in part because defendants cannot establish a fair use defense for the depictions of the logo in the highlight films, where the logo use is non-transformative and commercial. We reject defendants' con-

tention that Bouchat's request for injunctive relief against these acts of infringement is precluded, and the district court on remand will therefore consider whether an injunction is appropriate. We affirm the district court's finding of fair use as to the depictions of the logo in the Ravens corporate lobby, where team history is portrayed, free of charge.

I.

Bouchat owns the copyright in a drawing he created in 1995 and proposed for use as the Ravens team logo (the Shield logo). The Ravens used a strikingly similar logo design during the team's first three seasons, 1996, 1997, and 1998 (the Flying B logo). The Flying B logo was displayed on the side of the Ravens football helmet, painted on the Ravens field, and printed on flags, hats, tickets, and other assorted objects. Our first decision on this subject affirmed the jury's liability verdict, which found that the Ravens and the National Football League had infringed Bouchat's copyright in the Shield logo. *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350 (4th Cir. 2000) (*Bouchat I*). Our second decision affirmed a jury award of zero damages for the basic infringement. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514 (4th Cir. 2003) (*Bouchat II*). Our third decision, stemming from actions Bouchat filed against numerous NFL licensees that used the Flying B logo, affirmed judgments "in favor of the licensees because Bouchat [wa]s precluded from obtaining actual damages against them." *Bouchat v. Bon-Ton Dep't Stores, Inc.*, 506 F.3d 315, 328 (4th Cir. 2007) (*Bouchat III*).

This appeal arises from an action brought by Bouchat on February 14, 2008, against the Baltimore Ravens Limited Partnership (the Ravens), the National Football League and NFL Productions LLC (together, the NFL), and The Baltimore Sun Company.[1] Bouchat seeks an injunction prohibiting

---

[1]The Baltimore Sun Company was dismissed with prejudice on August 12, 2008, at Bouchat's request.

all current uses of the Flying B logo and requiring the destruction of all items exhibiting the Flying B logo.

The Ravens and the NFL currently display or otherwise make some use of the Flying B logo. The NFL offers for public sale Ravens highlight films of the 1996, 1997, and 1998 seasons. They are sold for fifty dollars each. The films were shot during and produced shortly after each season, and they have not been edited since their first release for sale. The Ravens organization also plays a short highlight film from the 1996 season on its large video screen during home games.

The highlight films contain actual game footage, edited with slow motion effects, musical scores, and a narration. The Flying B logo is displayed in the films just as it was during each game: the logo appears primarily on the helmets of the Ravens players. The logo also appears in other NFL team highlight films from the 1996, 1997, and 1998 seasons for those teams that played against the Ravens in that period. In the 1996 and 1997 Ravens season highlight films, the Flying B logo is prominently displayed as the introductory graphic. In the 1997 film the Flying B logo is displayed on a flag used as a backdrop for an interview, and the logo appears as a graphic next to the name of the interviewee.

The Flying B logo also appears in the lobby of the Ravens headquarters in Owings Mills, Maryland. The lobby is open to anyone entering the building. On one wall is a collage depicting the Ravens history, captioned "Ravens History Begins." Photos of the team's first ever first-round NFL draft picks, Jonathan Ogden and Ray Lewis, are prominently displayed in the collage. The photo of each man is from a Ravens football game, and their helmets display the Flying B logo. A glass cabinet in the lobby displays a sheet of Ravens football tickets from the 1996 inaugural season. The Flying B logo is displayed prominently on each ticket.

Absent a valid defense of fair use, defendants' current depictions of the Flying B logo would violate Bouchat's

copyright in the Shield logo. At a hearing before the district court on August 13, 2008, the parties agreed to submit the case to the court for a bench trial on the merits of defendants' fair use defense. On November 21, 2008, the district court issued a decision determining that all of defendants' depictions of Bouchat's copyright constituted fair use. Judgment was entered in favor of the Ravens and the NFL that same day. Bouchat appeals this final order, challenging the fair use determination. The Ravens and the NFL cross-appeal, asserting that Bouchat's claim is precluded.

## II.

The fair use defense presents a mixed question of law and fact. *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). In this arena we review the district court's legal conclusions de novo and its findings of fact for clear error. *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 201 (4th Cir. 1998). However, when "the district court has found facts sufficient to evaluate each of the statutory [fair use] factors, an appellate court need not remand for further factfinding but may conclude as a matter of law that the challenged use does not qualify as a fair use of the copyrighted work." *Harper & Row*, 471 U.S. at 560 (quotations omitted). The district court's factfinding is not challenged in this appeal.

Section 106 of the Copyright Act grants "a bundle of exclusive rights to the owner of the copyright," including the rights "to publish, copy, and distribute the author's work." *Harper & Row*, 471 U.S. at 546-47. These rights, however, are "subject to a list of statutory exceptions, including the exception for fair use provided in 17 U.S.C. § 107." *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003). Fair use is a complete defense to infringement. In other words, "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107.

Fair use was a creature of the common law until 1976 when the doctrine was codified in § 107 of the Copyright Act. *See*

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576 (1994). "Congress meant § 107 to restate the present judicial doctrine of fair use . . . and intended that the courts continue the common-law tradition of fair use adjudication." *Id.* at 577 (quotations omitted). Accordingly, the doctrine of fair use continues to be applied as "an equitable rule of reason, for which no generally applicable definition is possible." *Sundeman*, 142 F.3d at 202 (quotations omitted). The fair use inquiry is "not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577. Nevertheless, it is appropriate to use the four statutory factors listed in § 107 "[t]o guide the determination of whether a particular use is a fair use." *Bond*, 317 F.3d at 394. The four factors are as follows:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

We will proceed to measure each use of the Flying B logo by defendants against § 107's four factors. We will, of course, keep in mind that the factors are not to be "treated in isolation," but rather "the results [are to be] weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.

III.

A.

Defendants' first use of the Flying B logo that we analyze is its depiction in the season highlight films sold by the NFL and the highlight film played during the Ravens home football games.

1.

Under § 107's first factor we consider "the purpose and character of [defendants'] use [of the Flying B logo], including whether such use is of a commercial nature or is for non-profit educational purposes." 17 U.S.C. § 107(1). This inquiry "may be guided by the [fair use] examples given in the preamble to § 107," *Campbell*, 510 U.S. at 578, specifically, "criticism, comment, news reporting, teaching . . . scholarship, or research," 17 U.S.C. § 107. The 1996 highlight film played by the Ravens during home football games is part of an entertainment package included in the price of tickets to the games. The longer season highlight films for 1996, 1997, and 1998 are also objects of entertainment, marketed and sold to the public on the NFL's website for fifty dollars. The core commercial purpose of the highlight films does not align with the preamble's protected purposes of comment, news reporting, research, and the like.

Of course, the preamble is not meant to be an exhaustive list of fair use examples. *See Harper & Row*, 471 U.S. at 561. To help determine what else might count, we ask "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message; [we] ask[ ], in other words, whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 579 (citing Pierre N. Leval, Commentary, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)

(Leval)) (quotations omitted). "A 'transformative' use is one that 'employ[s] the [copyrighted work] in a different manner or for a different purpose from the original,' thus transforming it." *Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638 (4th Cir. 2009) (quoting Leval, *supra*).

A logo is an identifying symbol. The Flying B logo was designed and used as a symbol identifying whatever or whomever it adorned with the Baltimore Ravens football organization. A football player wearing a helmet with the Flying B logo is readily identified as a football player for the Ravens. The stadium field painted with the Flying B logo identifies it as the home field of the Ravens football team.

There is no transformative purpose behind the depiction of the Flying B logo in the highlight films. The use of the logo in the films serves the same purpose that it did when defendants first infringed Bouchat's copyrighted Shield logo design: the Flying B logo identifies the football player wearing it with the Baltimore Ravens. The simple act of filming the game in which the copyrighted work was displayed did not "add[ ] something new" to the logo. *Campbell*, 510 U.S. at 579. It did not "alter[ ] the [logo] with new expression, meaning or message." *Id.* The films capture the logo as it originally appeared, and the logo remains a symbol identifying the Ravens.

We disagree with the district court's conclusion that the purpose behind the use of the Flying B logo in the highlight films was "primarily historical." J.A. 56. While the films no doubt add to the historical record of Ravens play, the use of the logo in those films simply fulfilled its purpose of identifying the team. The logo continues to fulfill that purpose whenever a highlight film is shown. Two hypothetical circumstances illustrate our point. In the first, an individual at home in her living room in 1996 watches a Ravens football game on television. The Flying B logo on the helmets of one team helps her identify the team as the Ravens. In the second,

an individual at home today (2010) in his living room watches the 1996 Ravens season highlight film. The Flying B logo on the helmets of one team helps him identify the team as the Ravens. The logo plays the same role in each example. Its purpose is not transformed in the highlight film, viewed some fourteen years later.

Simply filming football games that include the copyrighted logo does not transform the purpose behind the logo's use into a historical one. Defendants point to the dramatic editing, music, and narration in the highlight films in an attempt to show a transformative use for the logo. But none of these effects transform the purpose behind the display of the logo. The narrator in the films never comments on the controversy surrounding the use of the Flying B logo. Nor are the films a documentary on the history of the Ravens logo. Instead, the films simply capture highlights of three Ravens seasons and necessarily portray the Flying B logo as it was actually used — to identify the Ravens team.

Merely labeling a use as historical does not create a presumption of fair use. Even the six uses specifically listed in the preamble to § 107 do not create presumptive categories of fair use protection. A transformative purpose is also required. *See Harper & Row*, 471 U.S. at 561 ("This listing was not intended . . . to single out any particular use as presumptively a 'fair' use."). For example, the use of a copyrighted work in news reporting (a use listed in § 107's preamble) must still be analyzed to determine if the purpose behind the use is transformative. *See id.* ("The issue is not what constitutes 'news,' but whether a claim of newsreporting is a valid fair use defense to an infringement of copyrightable expression.") (quotations and emphasis removed). Again, a transformative purpose involves a use of the copyrighted work "in a different manner or for a different purpose from the original." *Vanderhye*, 562 F.3d at 638 (quoting Leval, *supra*, at 1111). The historical use analysis employed by the district court was

fundamentally flawed because it did not sufficiently confront whether the challenged use had a transformative purpose.

The district court erred in minimizing the display of the Flying B logo as "incidental to the primary [historical] purpose [of the films]." J.A. 55. The proper inquiry relates to whether there is a transformative purpose behind the use, and "a taking may not be excused merely because it is insubstantial with respect to the *infringing* work." *Harper & Row*, 471 U.S. at 565 (emphasis in original). Again, because the logo is still being used as a logo, that is, as an identifying symbol of the Ravens, the purpose behind the use is not transformative.

Three cases from the Second Circuit suggest that the purpose and character of the use here weigh against a finding of fair use in the highlight films. First, in *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997), the Second Circuit found that the display of a poster of a copyrighted artwork as a set decoration for a television show did not constitute fair use, even though the show was creative and the copyrighted work was visible for a total of only 26.75 seconds. According to the court, the purpose and character of the use weighed against a finding of fair use because the defendants "used [the artist's] work for precisely a central purpose for which it was created — to be decorative." *Id.* at 79. Second, in *Davis v. The Gap, Inc.*, 246 F.3d 152, 156 (2d Cir. 2001), copyrighted decorative eyewear (specifically, "nonfunctional jewelry worn . . . in the manner of eyeglasses") was used by The Gap clothing company in one of its print advertisements. The Second Circuit found that the use was not a fair use and weighed the first factor against The Gap. The court "f[ou]nd nothing transformative about the Gap's presentation of [the] copyrighted work" because "[t]he ad shows [the decorative eyewear] being worn as eye jewelry in the manner it was made to be worn." *Id.* at 174. Third, in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006), a rock band's copyrighted concert posters were reproduced in a biography of the band. The posters were

shown in reduced size on an illustrated timeline of the band's history. The Second Circuit found the use of the posters to be "transformatively different." *Id.* at 609. The original purpose of the posters was to advertise "the band's forthcoming concerts," while the transformative purpose of the posters in the biography was "to document and represent the actual occurrence of [the] concert events featured on [the biography's] timeline." *Id.*

Here, just as in *Ringgold* and *Davis*, there is nothing transformative in the use of the Flying B logo in the season highlight films. The Flying B Logo remains a logo used to identify the Ravens, just like the decorative poster in *Ringgold* remained a decorative poster, and just like the decorative eyewear in *Davis* remained decorative eyewear worn as non-functional jewelry. Unlike in *Bill Graham Archives*, where the concert posters were put to transformative use (and no longer served the original advertising purpose), the logo here continues to identify the Ravens, as it did originally.

Consideration of the purpose and character of the use includes an examination of "whether [the] use is of a commercial nature or is for nonprofit educational purpose." 17 U.S.C. § 701(1). Here, the commercial purpose behind the season highlight films "'tends to weigh against a finding' that the challenged use is a 'fair use.'" *Bond*, 317 F.3d at 395 (quoting *Harper & Row*, 471 U.S. at 562). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.

It is customary for NFL teams to license their copyrighted logos for use in any number of commercial products. *See Bouchat III*, 506 F.3d at 325. Of course, Bouchat did not receive the customary price for the use of his copyrighted logo in the highlight films. Because defendants' use of Bouchat's logo is non-transformative, we have no hesitation

in concluding that the commercial nature of the use weighs against a finding of fair use. *Cf. Campbell*, 510 U.S. at 579 ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.").

Finally, because the codified fair use doctrine remains an "equitable rule of reason," *Sundeman*, 142 F.3d at 202, "the propriety of the defendant[s'] conduct" is "relevant to the 'character' of the use," *Harper & Row*, 471 U.S. at 562 (quotations omitted). The Ravens and the NFL are not innocent third parties documenting the history of the Ravens or the Ravens logo. Instead, defendants were responsible for the original copyright infringement, the use of the Flying B as the Ravens logo. Defendants cannot assert that it is a fair use to profit from that very same copyright infringement when the purpose of the use is not transformed.

In sum, the purpose and the character of the use of the Flying B logo weighs against a finding of fair use in the depiction of the logo in the highlight films.

2.

The second statutory factor directs us to consider "the nature of the copyrighted work." 17 U.S.C. § 107(2). The copyrighted work here is a creative drawing, and "[c]reative works . . . are closer to the core of works protected by the Copyright Act." *Sundeman*, 142 F.3d at 204. We agree with the district court that the creative nature of Bouchat's work "would . . . tend to indicate that making a copy would not be fair use." J.A. 56. This factor weighs against a finding of fair use of the Flying B logo in the highlight films.

3.

The third factor directs us to consider "the amount and substantiality of the portion used in relation to the copyrighted

work as a whole." 17 U.S.C. § 107(3). "Copying an entire work weighs against finding a fair use." *Sundeman*, 142 F.3d at 205.

Bouchat's entire work is reproduced in the highlight films. The "ordinary effect" of "the fact that the entire work is reproduced . . . militat[es] against a finding of fair use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-50 (1984). Of course, the inquiry "harken[s] back to the first of the statutory factors, for . . . we recognize that the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. Unless the use is transformative, the use of a copyrighted work in its entirety will normally weigh against a finding of fair use.

The district court weighed the third factor in favor of finding a fair use because "the Flying B logo, although depicted in its entirety, is not a major component of the entire work in which it is used." J.A. 57. In other words, "the copyright protected work is only an inconsequential portion of the overall work." *Id.* This conclusion was error because "a taking may not be excused merely because it is insubstantial with respect to the *infringing* work," for "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Harper & Row*, 471 U.S. at 565 (quotations omitted) (emphasis in original). What matters is the amount of the copyrighted work used. Here, Bouchat's entire work was copied.

We consequently weigh the third factor against a finding of fair use.

## 4.

The fourth factor directs us to consider "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. "This last factor is undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566. We "consider not only the extent of market

harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotations omitted). In other words, "to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *Harper & Row*, 471 U.S. at 568 (quotations omitted) (emphasis in original).

We note first that, in pressing their affirmative defense, the Ravens and the NFL "have difficulty carrying the burden of demonstrating fair use without favorable evidence" about a potential market, especially since the entire copyrighted work is used without a transformative purpose. *Campbell*, 510 U.S. at 590-91. The Ravens and the NFL did not submit any evidence to the district court about potential markets.

Despite their lack of evidence about potential markets, defendants argue that the fourth factor (market effect) weighs in favor of fair use because "[a] jury has already determined . . . that none of Defendants' profits from their active use of the Flying B logo in merchandise was attributable to Bouchat's work." Br. for Defendants-Appellees at 27 (citing *Bouchat II*, 346 F.3d at 519). However, a finding that none of defendants' profits derived from the Flying B logo has no bearing on "the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). If a football team decides that it needs a logo, it can either design one itself or hire a graphic artist to design one. A market does not fail to exist for the product of the designer's services (here, the logo) simply because the football team's profits do not ultimately derive from the use of that logo.

The existence of a market for Bouchat's product is entirely consistent with the earlier jury finding. We affirmed the jury determination of zero damages despite the fact that the Rav-

ens and the NFL "derive revenues from . . . royalties from licensees who sell official team merchandise." *Bouchat II*, 346 F.3d at 523. The licensing of NFL logos for use in the sale of official team merchandise, in exchange for royalties, is exactly the type of potential market that exists for Bouchat's copyrighted logo. Indeed, Bouchat could have pursued actual damages against the licensees of the Flying B logo if we had not concluded that he was barred by claim preclusion. Preclusion was triggered because Bouchat sued the Ravens and the NFL first in *Bouchat I*, where he did not pursue actual damages. *See Bouchat III*, 506 F.3d at 326-29.

In fact, we know that there was a market for Bouchat's copyrighted logo when the Ravens used the Flying B logo for the 1996, 1997, and 1998 seasons. In 1996 the NFL granted "licenses and other forms of permission" allowing the Flying B logo to be "used by hundreds of manufacturers, distributors, sponsors, etc. in connection with their respective business operations." *Bouchat v. Champion Products, Inc.*, 327 F. Supp. 2d 537, 540 (D. Md. 2003). Defendants did not offer evidence to show that this licensing market no longer exists, and we conclude that there is a potential market for Bouchat's copyrighted work. The NFL sells on its website a number of consumer products that are decorated with historic logos from various NFL teams and marketed as "throwback" merchandise. In light of the market in licensing historic logos, defendants' unrestricted use of the infringing Flying B logo "would result in a substantially adverse impact on the potential market for [Bouchat's] original" logo. *Campbell*, 510 U.S. at 590 (quotations omitted).

When a use is not transformative, market substitution is more likely. *Cf. Campbell*, 510 U.S. at 591 ("[W]hen . . . the second use is transformative, market substitution is at least less certain."); *see also Vanderhye*, 562 F.3d at 643 ("[T]he transformative nature of the use is relevant to the market effect factor."). Moreover, "when a commercial use amounts to mere duplication of the entirety of an original it clearly

supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Campbell*, 510 U.S. at 591 (quotations omitted). We have already found that defendants' use of the Flying B logo in the highlight films is not transformative and that the logo is used for a commercial purpose. These findings, and defendants' failure to show the lack of a market, require us to weigh the fourth factor against a finding of fair use.

### 5.

We have considered each of the four statutory factors separately and found that each one goes against a finding of fair use. The codified fair use doctrine is applied as "an equitable rule of reason," *Sundeman*, 142 F.3d at 202, which means that the results of every factor's analysis are weighed together in determining whether there is fair use, *Campbell*, 510 U.S. at 578. After weighing together the results from the analyses of the four factors, we easily conclude that the use of the Flying B logo in the highlight films is not a fair use. The Ravens and the NFL originally violated Bouchat's copyright by using his logo as the Ravens logo. Highlight films that come along later and depict that same use, without transformation, cannot stand as a fair use. Therefore, the depiction of the Flying B logo in the season highlight films sold by the NFL and the highlight film played during the Ravens home football games is an infringement of Bouchat's copyright.

### B.

Next, we analyze the depictions of the Flying B logo in the lobby of the Ravens corporate headquarters, again using § 107's four factors.

### 1.

As we said above, evaluation of § 107's first factor — purpose and character of the use — may be guided by the fair use

examples mentioned in § 107's preamble. *Supra* at 7. The lobby of the Ravens headquarters has an area that is dedicated to the history of the team. The use of a copyrighted work in a museum-like setting is akin to the fair use of a work for "teaching . . ., scholarship, or research," fair uses listed in the preamble to § 107. 17 U.S.C. § 107. The Flying B logo is displayed in the Ravens lobby on actual game tickets from the inaugural season and in two large photos of the team's first ever first-round draft picks. These depictions of the logo are consistent with the fair use display of copyrighted material in a museum.

Most important, the use of the logo in a museum-like setting "adds something new" to its original purpose as a symbol identifying the Ravens. *Campbell*, 510 U.S. at 579. The season tickets and the player photos adorned with the Flying B logo are displayed to represent the inaugural season and the team's first draft picks. In this way, the logo is used "not for its expressive content, but rather for its . . . factual content." *Bond*, 317 F.3d at 396. This use is comparable to the use of the concert posters in *Bill Graham Archives*, 448 F.3d at 609, where the posters documented the fact of past concerts, a transformatively different purpose from their original use as advertisements for future concerts.

Finally, unlike in the highlight films, there is no clear-cut commercial purpose behind the use of the logo in the Ravens lobby. The lobby is open to the public, free of charge. "If a challenged use of a copyrighted work is noncommercial, the party alleging infringement must demonstrate 'either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work.'" *Bond*, 317 F.3d at 395 (quoting *Sony*, 464 U.S. at 451). Bouchat presented no evidence as to how the lobby depictions have harmed or might harm his market, and the apparent noncommercial nature of the lobby use therefore "weighs heavily against [his] infringement claim" with respect to that use. *Id.*

"[I]t is appropriate to evaluate [the use's] commercial status on its own terms." 4-13 David Nimmer & Melville, *Nimmer on Copyright* § 13.05[A][1][c]. Here, the Ravens were "not gaining direct or immediate commercial advantage from" the depictions of the logo in the lobby "— *i.e.*, [the team's] profits, revenues, and overall commercial performance were not tied to" this use. *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 921 (2d Cir. 1994). At bottom, we find no commercial use because no fee is charged to view the displays in the lobby of the Ravens corporate headquarters.

Although the Ravens remain responsible for the original act of infringement, the noncommercial purpose and character of the use in the lobby works in favor of a finding of fair use there. On the other hand, the character of the use in the highlight films is particularly indefensible because the Ravens and the NFL are exploiting to their commercial advantage their original infringements. In the lobby, however, the Ravens are displaying their team history without any direct or immediate financial remuneration.

Because there is a transformative, noncommercial purpose behind the depiction of the Flying B logo in the Ravens lobby, we weigh the first factor — purpose and character of the use — in favor of fair use.

2.

With respect to the use of the Flying B logo in the lobby, we agree with the district court that the second statutory fair use factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), tends to weigh against a finding of fair use, *see Campbell*, 510 U.S. at 586. However, as the Supreme Court has explained, the second factor "is not much help" in deciding whether the "copy[ing] [of] publicly known, expressive works" is fair use. *Id.* More particularly, "the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." *Bill Graham*

*Archives*, 448 F.3d at 612. As mentioned above, the transformative purpose of the lobby use was to display a set of inaugural season tickets and photographs of the team's first ever draft picks, all picturing the Flying B logo in use at the time. Even in this transformative use, however, the logo's creative expression is still apparent. Although we do not assign much weight to "the nature of the copyrighted work" factor, the durability of the copied logo's creative expression leads us to conclude that this factor tilts slightly against a finding of fair use.

3.

The third statutory fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The fact that Bouchat's entire work (in the form of the Flying B logo) is reproduced in the displays in the lobby "militat[es] against a finding of fair use." *Sony*, 464 U.S. at 449-50. However, "it does not preclude a finding of fair use," *Sundeman*, 142 F.3d at 205, because "the extent of permissible copying varies with the purpose and character of the use," *Campbell*, 510 U.S. at 586-87.

Here, "when the extent of the copying is considered with the purpose and character of the uses, the amount and substance of the copies are justified." *Sundeman*, 142 F.3d at 206. The Ravens have no choice but to use the entire copyrighted work if they wish to display the inaugural season tickets and the photographs of their first ever draft picks in their original team dress. The tickets were originally printed with the entire logo, and the players dressed with the entire logo on their helmets. Therefore, in order to fulfill the legitimate transformative purpose of exhibiting the Ravens inaugural season tickets and the photos of the team's first ever draft picks, the entire work has to be displayed.

The third factor, when applied to the uses of the logo in the lobby, does not weigh against a finding of fair use because the

amount copied is justified in relation to the transformative purpose behind the use. However, because the entire work is displayed, we decline to weigh the third factor in favor of fair use. The third factor is neutral.

4.

The fourth statutory fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Earlier, in considering the high-light films, we weighed this factor against a finding of fair use because the use was both nontransformative and commercial. The use of the logo in the Ravens lobby, however, is both transformative and noncommercial. When the "use is transfor-mative, market substitution is at least less certain, and market harm may not be so readily inferred." *Campbell*, 510 U.S. at 591. Moreover, when the use "is for a noncommercial pur-pose, the likelihood [of future market harm] must be demon-strated" by the copyright holder. *Sony*, 464 U.S. at 451. Bouchat offered no evidence of market harm as a result of the lobby displays. The transformative and noncommercial use in the lobby and the lack of evidence about market harm leads us to weigh the market effect factor in favor of a finding of fair use.

5.

The first (purpose and character of the use) and fourth (effect of use upon the market) factors weigh in favor of a finding of fair use, the second factor (nature of the copy-righted work) weighs only slightly against, and the third fac-tor (extent of the use) is neutral. Considering the § 107 factors together, we find that the use of the Flying B logo in the Rav-ens lobby is a fair use. The transformative, noncommercial uses documenting (by ticket display) the inaugural season games and portraying (in team uniform) the Ravens first ever draft picks are fair uses. Therefore, the current depictions of the Flying B logo in the Ravens lobby are not infringements.

IV.

Because the depiction of the Flying B logo in the highlight films is an infringement of Bouchat's copyrighted work, we must consider the Ravens and the NFL's alternative argument for affirmance. Defendants argue that Bouchat's pending suit against them seeking injunctive relief against current infringement is barred by claim preclusion: in *Bouchat I*, an infringement suit for damages that proceeded to judgment, Bouchat did not seek, but could have sought, to enjoin defendants from using the Flying B logo. Here, the district court did not reach the preclusion issue because the court awarded judgment to defendants based on the defense of fair use. However, the district court "note[d] that [it] does not agree with Defendants that Bouchat would be procedurally prevented from obtaining [injunctive] relief . . . if the Defendants' use of the Flying B Logo were not held to be fair use under the Copyright Act." J.A. 52 n.10.

A three-element test, which we applied in *Bouchat III*, governs whether Bouchat's claim for injunctive relief in this case is barred by principles of preclusion: "A subsequent claim is precluded when (1) the judgment in the prior action was final and on the merits; (2) the parties in the two actions are identical or in privity; and (3) the claims in the two actions are identical." 506 F.3d at 326-27. Defendants satisfy the first two elements without dispute. They do not satisfy the third element, however.

Bouchat's infringement claim for injunctive relief in this case is not identical to his earlier claim. "Each act of infringement is a distinct harm giving rise to an independent claim for relief." *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 204 (4th Cir. 1997) (quoting *Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir. 1992)); *see also Meekins v. United Transp. Union*, 946 F.2d 1054, 1058 (4th Cir. 1991) ("Res judicata has very little applicability to a fact situation involving a continuing series of acts, for generally

each act gives rise to new cause of action.") (quotations omitted). The earlier claim sought damages for infringements that took place prior to final judgment, issued on July 26, 2002. *Bouchat II*, 346 F.3d at 519. Bouchat now seeks an injunction against present infringements of his copyrighted work. These infringements "giv[e] rise to an independent claim for relief" and are therefore not identical to the earlier claim for purposes of preclusion. *Hotaling*, 118 F.3d at 204.

In *Bouchat III* we held that Bouchat was precluded from bringing claims for damages against licensees that used the infringing logos in various endeavors, including the production and marketing of official Ravens merchandise. Bouchat's suits against the licensees involved *the very same acts of infringement* at issue in his earlier suit against the licensors. 506 F.3d at 327-28 ("While [the first suit] focused on the licensor[s'] conduct, and [the subsequent suits] shift the focus to the licensees' conduct, the same violations of Bouchat's copyright are described throughout all of the complaints."). In other words, the acts of infringement by the licensees were the flip side of the same coin whose other side showed the same acts of infringement by the licensors. Here, on the other hand, Bouchat is asserting a claim to enjoin different acts of infringement, namely, the present acts of infringement by the Ravens and the NFL, including the use of the logo in the highlight films. This action is not barred by claim preclusion.

V.

We reverse in part because the Ravens and the NFL did not establish fair use of the Flying B logo in the highlight films sold by the NFL and the highlight film played during the Ravens home football games. The films infringe on Bouchat's copyrighted work, and his request for injunctive relief against this infringement is not precluded. On remand the district court will consider whether an injunction is appropriate.[2] We

---

[2]The dissent (part IV), ignoring Supreme Court guidance, would deny injunctive relief to Bouchat without permitting the district court to decide

affirm the district court's determination of fair use of the Flying B logo on the items displayed in the Ravens corporate lobby.

*REVERSED AND REMANDED IN PART; AFFIRMED IN PART*

NIEMEYER, Circuit Judge, dissenting:

When the Baltimore Ravens professional football team played its first game in franchise history on September 1, 1996, playing the Oakland Raiders, it did so at its home field, which was painted with a "Flying B Logo." The Logo was also displayed on the helmets of the players, on tickets, on flags, and on other related items. The game, which was played before a crowd of 64,124, was televised live and recorded for posterity by NBC.

The Flying B Logo, consisting of a winged shield on which was displayed a flying "B" and the name "Ravens," had apparently been copied from the "Shield Drawing" that had been created and submitted to the Ravens by an amateur artist, Frederick Bouchat. Bouchat's Shield Drawing depicted a raven with its wings spread, holding in its beak a shield on which was displayed a flying "B" and the name "Ravens."

After the Ravens' first season, Bouchat filed a copyright action against the Ravens and the National Football League, alleging that the Flying B Logo infringed his copyright in the

in the first place whether to grant or deny that relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006) ("[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts."). In *eBay* the Supreme Court was careful to "take no position on whether permanent injunctive relief should or should not issue in th[at] . . . case." *Id.* It "vacate[d] the judgment of the Court of Appeals, so that the District Court [could] apply [the governing] framework in the first instance." *Id.*

Shield Drawing. After a jury found infringement, the Ravens and the NFL ceased using the Flying B Logo and adopted a new logo consisting of the profile of a raven's head with a "B" superimposed on it (the "Raven Profile Logo"), which they have used since the 1999 season. From that time on, the Raven Profile Logo has been the identifying symbol of the franchise, and the Ravens and the NFL have not used the Flying B Logo to identify the Ravens in any way. Although the Ravens and the NFL have not placed the Flying B Logo on any item since 1998, it remains visible in memorabilia, photographs, and video highlights from the Ravens' first three seasons, as part of the team's history then recorded.

Frederick Bouchat commenced this action against the Baltimore Ravens Limited Partnership ("the Ravens"), the National Football League, and NFL Productions, LLC (collectively, "the NFL"), seeking an injunction prohibiting the sale and display of any items that include the Flying B Logo and requiring the destruction of all items on which the Logo is included. Following a bench trial, the district court found that the defendants' purpose in displaying and selling memorabilia and game highlights from the Ravens' first three seasons is "primarily historical" and that the display of the Flying B Logo in this context is "incidental to the [historical] purpose." *Bouchat v. Baltimore Ravens Ltd. P'ship*, 587 F. Supp. 2d 686, 696 (D. Md. 2008). It also found that this incidental historical use of the Flying B Logo has no negative effect on the value of, or the market for, Bouchat's Shield Drawing. It thus concluded that the defendants' current use of the Flying B Logo in memorabilia and game highlights does not infringe Bouchat's copyright because it constitutes "fair use" under the Copyright Act of 1976, 17 U.S.C. § 107.

I agree with this conclusion and therefore would affirm.

I

In 1995, when the Cleveland Browns announced that they would move from Cleveland to Baltimore, Frederick Bouchat,

an amateur artist working as a security guard at a state office building in Baltimore, began drawing a series of logos for the potential mascots that were being mentioned in the media. One of these logos was the Shield Drawing.

In April 1996, after the "Ravens" name had been selected, Bouchat faxed a copy of the Shield Drawing to the office of the Maryland Stadium Authority, asking the chairman of the Stadium Authority to send the drawing to the president of the Ravens. Bouchat included a note stating, "If he would like this design if he does use it I would like a letter of recognition and if the team wants to I would like an [autographed] helmet."

As the district court found, "Through a series of misunderstandings, Bouchat's Shield drawing was sent to the Stadium Authority Chairman's law office, forwarded to the Ravens' temporary headquarters, forwarded to the NFL in New York and then to the commercial artists working on the Ravens project. There is no reason to believe that the Ravens or NFL intentionally caused the Shield drawing to be provided to the artists." *Bouchat*, 587 Supp. 2d at 693. Nonetheless, the artists used the drawing as the basis for the Flying B Logo that was adopted and used by the Ravens to identify the franchise. The Logo was displayed on the football field, on the players' helmets, on tickets, and on other items related to the franchise.

When the Ravens' uniform was first unveiled in Baltimore in June 1996, Bouchat noticed the striking similarities between his Shield Drawing and the Flying B Logo. Concerned that the Ravens and the NFL had appropriated his Shield Drawing without permission, Bouchat sought legal counsel and, in August 1996, registered the Shield Drawing with the United States Patent and Trademark Office. He did not, however, register any objection with the Ravens or the NFL, and the team played its first season, using the Flying B Logo, unaware of Bouchat's concern.

In May 1997, after the Ravens' first full season, Bouchat commenced an action against the Ravens and the NFL for copyright infringement, seeking only damages. *Bouchat v. Baltimore Ravens, Inc.*, No. MJG-97-1470 (D. Md.). He did not request any injunctive relief. In November 1998, a jury returned a verdict finding that the Flying B Logo infringed Bouchat's copyright in the Shield Drawing. Even though the Ravens and the NFL filed an interlocutory appeal from the verdict—*i.e.*, before damages were considered—they immediately ceased using the Flying B Logo and adopted, instead, the Raven Profile Logo to identify the franchise.

Since the beginning of the 1999 season, the Ravens and the NFL have continuously used the Raven Profile Logo. But while the Ravens and the NFL have not identified the Ravens' franchise with the Flying B Logo since 1998, the Logo has not completely disappeared, as it can still be seen on all visual depictions of players' uniforms, tickets, and other memorabilia from the 1996-98 seasons.

After the Ravens and the NFL made the change in the Ravens' identifying logo, the parties completed the copyright-infringement litigation, trying the issue of damages. Bouchat claimed entitlement to the portion of the Ravens' and the NFL's profits attributable to the infringing Flying B Logo, but the jury found that no profit had been realized from use of the Logo and denied Bouchat damages.

In this action, Bouchat now seeks, for the first time, to enjoin the Ravens and the NFL from using or displaying the Flying B Logo in any way and in any place. He objects, in particular, to the fact that at its headquarters, as part of a tribute to the history of the franchise, the Ravens display memorabilia and photographs from its first three seasons in which the Flying B Logo is visible. He also objects to the showing and selling of game highlights from the first three seasons—1996, 1997, and 1998. The injunction that Bouchat seeks would prevent the Ravens and the NFL from displaying the

Flying B Logo in any way and for any purpose and would require the defendants to deliver for destruction any item that contains the Logo, including game highlights of other NFL teams when playing the Ravens during the 1996-98 seasons.

Following a bench trial, the district court concluded that the Ravens and the NFL's current use of the Flying B Logo does not infringe Bouchat's copyright in the Shield Drawing because such use constitutes "fair use" under 17 U.S.C. § 107. The court found that the defendants' use of the Flying B Logo in displaying memorabilia and showing and selling game highlights from the Ravens' first three seasons is for "an essentially historical purpose." *Bouchat*, 587 F. Supp. 2d at 695. It noted that "the visibility of the logo on players' uniforms is incidental to the purpose of showing films of the 1996-98 team in action." *Id.* at 696. It also found that "the nature and purpose of the use at issue are primarily historical with only an incidental, in context, insignificant, commercial purpose." *Id.* Finally, it found that the defendants' use of the Flying B Logo has no adverse effect on the value of, or the market for, Bouchat's Shield Drawing. *Id.* at 697.

From the district court's judgment in favor of the defendants, entered on November 21, 2008, Bouchat filed this appeal.

## II

Recognizing the Copyright Act's goal "[t]o promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, by ultimately providing "access to the products of [authors'] genius," *see Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984); *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003), the Copyright Act, through the fair use doctrine, denies authors any monopoly over new works that are derivative and transformative, *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). The fair use doctrine "guarantee[s] . . . breathing space within the con-

fines of copyright" for transformative works, and "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* "A 'transformative' use is one that 'employ[s] the quoted matter in a different manner or for a different purpose from the original,' thus transforming it." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638 (4th Cir. 2009) (quoting Pierre N. Leval, Commentary, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)).

The Copyright Act thus provides that the fair use of a copyrighted work is not an infringement of copyright. 17 U.S.C. § 107; *see also Sony*, 464 U.S. at 433 ("Any individual may reproduce a copyrighted work for a 'fair use'; the copyright owner does not possess the exclusive right to such a use").

In determining whether a particular use is fair use, § 107 provides a non-exhaustive list of factors to guide a court:

(1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)   the nature of the copyrighted work;

(3)   the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)   the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. These factors are not to be considered bright-line rules, rigidly applied, *see Sony*, 464 U.S. at 449 n.31, but rather are intended to "provide only general guidance," *Campbell*, 510 U.S. at 577. *See also Bond*, 317 F.3d at 394.

### III

In this case, the Ravens display the Flying B Logo *only* in connection with memorabilia and highlights chronicling the first three seasons of the franchise. These memorabilia and game highlights are historical and biographical, and the Ravens' only purpose in displaying the Flying B Logo now is to recount and recall that history, as the district court found. The incidental and necessary display of the Flying B Logo in connection with these items is totally transformative of the use of the Flying B Logo—changing from its use as the symbol identifying the Ravens' franchise to its use as an incidental and necessary part of history.

This transformation is fundamental and critical to an analysis of fair use, inasmuch as transformation lies at the "heart" of the fair use doctrine. *See Campbell*, 510 U.S. at 579. Virtually every case that has considered such a historical and biographical use has held it to be transformative and therefore fair use. *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609-10 (2d Cir. 2006) (finding the use of images of concert posters in a biographical account of the Grateful Dead to be transformative because the posters were being used to highlight historical facts, a purpose "plainly different from the original purpose for which they were created"); *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (observing, in the context of a video documentary about the life of Elvis Presley, that "Passport's use of many of the television clips is transformative because they are cited as historical reference points in the life of a remarkable entertainer").

The majority overlooks entirely the fact that in 1999, the Ravens and the NFL adopted the Raven Profile Logo as the symbol identifying the Ravens' franchise. Indeed, it does not even recite that fact. Only with this omission can it conclude that the display now of the Flying B Logo in historical items is for the same purpose for which it was displayed in 1996-98.

Were it to recognize the change in identifying logo, the majority would have had to conclude that a transformation in use had occurred that relegates the original display to merely historical interest. Thus, it is simply inaccurate to say, as the majority does, that the Flying B Logo is being used by the Ravens for the same purpose today that it was in the years 1996-98—it "remains a logo used to identify the Ravens." *Ante* at 11.

The display now of the Flying B Logo in memorabilia and game highlights from the Ravens' first three seasons is both *incidental* and *necessary* to the new purpose for which it is being used—recounting and recalling history—inasmuch as history cannot be fabricated or created. To display, in the lobby of the Ravens' headquarters, 1996 pictures of the Ravens' 1996 draft choices, Ray Lewis and Jonathan Ogden, as "the team's first ever first-round NFL draft picks," *ante* at 4, is momentous because of their subsequent success as players. The fact that their helmets included the Flying B Logo is an incidental fact of history, made more so by the fact that the Ravens and the NFL no longer use the Flying B Logo to identify the Ravens' franchise.

In holding that the use of the Flying B Logo in this context is transformative because it "'adds something new' to [the Logo's] original purpose as a symbol identifying the Ravens," *ante* at 17(quoting *Campbell*, 510 U.S. at 579), the majority recognizes this fact. Yet the majority attempts to distinguish this use of the Flying B Logo from its use in game highlights, which, the majority holds, is not transformative. But the display of the Flying B Logo in video highlights from the Ravens' first three seasons is even *more* incidental and unimportant than the display of the Logo in the Ravens' headquarters. The highlights are selected solely because of the team's play on the field and the importance of that play to the Ravens' history. There is no evidence or suggestion that the Ravens collected the highlights from the first three years to display the Flying B Logo or to promote the team through it.

Any such suggestion could only be fanciful, ignoring entirely the fact that the Ravens and the NFL have identified the Ravens since 1999 exclusively by the Raven Profile Logo.

The Ravens' use of the Flying B Logo is therefore necessary for its *new purpose* of recounting and recalling franchise history, and *that use has no value for—indeed it is irrelevant to—the original purpose of identifying the franchise, as the franchise is now identified by the Raven Profile Logo*. And it follows that any monetary motive in recounting and recalling history through memorabilia and highlights is based on the value of the *history*, not the value of the Flying B Logo. As the Supreme Court has pointed out, the inquiry into the commercial nature of a use under the first statutory factor of § 107 is not whether the Ravens received money from the sale of memorabilia or video highlights—as the majority finds important—but whether the Ravens "stand[ ] to profit from *exploitation of the copyrighted matter*." *Harper & Rowe, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). Nothing in the memorabilia or game highlights indicates that the Flying B Logo itself provides the Ravens any gain. Rather, it is the nature of the game performances, the players' performances, and the competition between football teams that provides the Ravens with value from the memorabilia and game highlights.

Indeed, a jury found in 1998 that the Ravens did not earn any profit from the display of the Flying B Logo at a time when the Logo was actually being used as the franchise identifier. It can hardly be argued that the same logo used only incidentally and historically now provides the Ravens with value and somehow denies Bouchat the value of his Shield Drawing. Because the new use—so far removed and so different in purpose from the original use—is completely transformative, any potentially miniscule commercial advantage gained in connection with the new use is outweighed by the sheer magnitude of the transformation. *See Campbell*, 510 U.S. at 579 ("[T]he more transformative the new work, the

less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use").

It should not require the Supreme Court to instruct us that the Ravens' incidental and necessary use of the Flying B Logo in memorabilia and game highlights is transformative—the heart of the fair use doctrine—and therefore does not infringe Bouchat's copyright. *See* 17 U.S.C. § 107. Unfortunately, however, it does.

IV

In addition to the transformative character of the Ravens' use of the Flying B Logo, equitable and practical considerations weigh in favor of finding the use at issue to be fair use. It is indeed true that the Ravens and the NFL infringed Bouchat's copyright in the Shield Drawing during the first three years of the Ravens' history. But we are not now evaluating the merits of the Ravens' use of the Flying B Logo to identify the Ravens' franchise, as it did during the 1996-98 seasons. We accept that as fact. Rather, we are called upon to assess the merits of the Ravens' new use of the Flying B Logo as an incidental and necessary component of its recorded history.

In making this assessment, it must be noted that Bouchat himself could have avoided some or all of the harm, if any, that he now seeks to redress. Bouchat learned of the potential infringement when the Ravens' uniform was first introduced in June 1996, long before the beginning of the Ravens' first season. Yet he did nothing to alert the Ravens or the NFL of his concern. Rather, he let the Ravens play its entire first season with the Flying B Logo as its identifying symbol, thus allowing the creation of the history he now seeks to enjoin. For their part, the Ravens and the NFL stopped using the Flying B Logo—never to use it again to identify the Ravens—as soon as the jury concluded in November 1998 that the Flying B Logo did infringe Bouchat's Shield Drawing. But by that

time the 1996-98 seasons had become history, and during every game that the Ravens played, team members wore uniforms displaying the Flying B Logo.

In seeking now to prohibit the Ravens and the NFL from displaying any photograph or film from the Ravens' first three seasons in which the Flying B Logo is visible, Bouchat effectively seeks to blot out three years of the Ravens' football history. Indeed, the remedy Bouchat seeks is even more extensive, as he would also require the NFL to blot out the histories of any of the 24 NFL teams that played the Ravens during the 1996-98 seasons, because the memorabilia and films from those games also include incidental displays of the Flying B Logo.

In truth, Bouchat's goal in seeking the injunction he now requests cannot be to prohibit the display of the Flying B Logo. An injunction prohibiting any display of the Logo will do him no good, as his Shield Drawing's notoriety and value depend on the display of the Flying B Logo in connection with the Ravens' franchise. Rather, through this legal action, Bouchat is attempting to hold the Ravens' history hostage for ransom. *See generally* Ronald Coase, *The Nature of the Firm*, 4 Economica 386 (1937). But it would be grossly inequitable and would bear no relation to the true source of value in the memorabilia and video highlights at issue—namely, their status as historical artifacts—to allow Bouchat to leverage the incidental use of his copyrighted logo into control over the display of all images, video, and memorabilia from the first three years of Ravens history. As an "'equitable rule of reason,'" whose terms are not to be rigidly applied, *Sony*, 464 U.S. at 448 n.31 (quoting H.R. Rep. No. 94-1476, at 65 (1976)), fair use should be broad enough to allow the Ravens to display the history *it created*, even though the Flying B Logo will necessarily appear as an incidental aspect of that history.

In short, if fair use is not now recognized in the transformative use of the Flying B Logo—a use only incidental and nec-

essary to the display and sale of memorabilia and game highlights—the policy of the Copyright Act, as explained in *Sony* and *Campbell*, will not only be frustrated, but the consequence of any remedy against the Ravens and the NFL will be unreasonable and inequitable. *See Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 544 (4th Cir. 2007) (denying a permanent injunction against the sale of a house built with copyright-infringing architectural plans because such a "draconian burden" was not justified by the right that the plaintiff claimed had been violated).

The Ravens and the NFL cannot now change history nor can they reasonably be requested to blot it out. They have not attempted to reinstate the Flying B Logo as the identifying symbol of the Ravens' franchise, nor have they focused on the Logo in any way. Rather, they seek only to display memorabilia and historic images which of necessity still contain the Flying B Logo. This is surely a transformative use, lying squarely in the "heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." *Campbell*, 510 U.S. at 579.

For the foregoing reasons, I would affirm the judgment of the district court, which I conclude is manifestly correct.